IN THE MATTER OF THE APPLICATION OF THE INSURANCE RATING BOARD FOR APPROVAL OF INCREASES IN PRIVATE PASSENGER AUTOMOBILE LIABILITY RATES AND PHYSICAL DAMAGE INSURANCE RATES PROPOSED BY THE INSURANCE RATING BOARD.

INSURANCE SERVICES OFFICE AS SUCCESSOR IN INTEREST OF INSURANCE RATING BOARD, NATIONAL AUTOMOBILE UNDERWRITERS ASSOCIATION AND NATIONAL BUREAU OF CASUALTY UNDERWRITERS, APPELLANTS.

Argued April 24, 1973—Decided July 11, 1973.

*Mr. Stephen B. Wiley* argued the cause for appellants (*Mr. Lawrence Berman,* of the New York bar, of counsel; *Mr. Thomas D. Hogan,* on the brief).

*Mr. Sheldon A. Weiss* argued the cause for respondent (*Mr. Isadore Glauberman,* Special Counsel appointed by the Attorney General to represent the Public, attorney).

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for respondent New Jersey Department of Insurance (*Mr. Steven R. Bolson,* Deputy Attorney General, on the brief; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

PER CURIAM. This matter was before us in *In re Insurance Rating Board,* 55 *N. J.* 19 (1969). The then Commissioner of Banking and Insurance denied approval of rate filings for increases (1) for automobile liability insurance and (2) for collision and other physical damage coverage. We remanded the matter to the department for further consideration but retained jurisdiction. Further hearings were held by the Commissioner of Insurance (successor to the Commissioner of Banking and Insurance) and a new determination made. Both the Insurance Rating Board (herein IRB) and Special Counsel appointed by the Attorney General to represent the Public seek a review of that determination.

The parties had started with the premise that the insurer should receive 5% of premiums for underwriting profit and contingencies but disagreed as to whether there should be deducted from that sum the income received by the insurer from investment of funds supplied by policyholders, *i. e.,*

the reserve for unearned premiums and the reserve for losses. We concluded tentatively that such earnings could not be disregarded in fixing a reasonable profit for the insurers mandated by *N. J. S. A.* 17:29A–11, but we wanted to know the basis for the premise that 5% of premiums was the proper rate. On the remand the Commissioner found "there is no substantive basis for the 5% provision for underwriting profit and contingency other than its historical acceptance in this State in connection with prior rate filings."

Indeed upon the remand, IRB abandoned the proposition that 5% of premiums constituted a fair profit for the risk the insurers took. Instead, by analogy to rate-making in the case of a public utility, IRB sought a fair return upon the funds supplied by stockholders. Upon that approach, the earnings from the funds supplied by policyholders (the two reserve accounts mentioned above) were taken into account as we had tentatively said they must be, but so also were the total gains from the investment of the funds supplied by stockholders. Stock analysts for IRB testified that a return of at least 12% after federal income taxes on stockholders' investment was needed to attract and retain capital in the insurance business. IRB sought a provision in the rates for a 9% underwriting profit on stockholder-supplied funds, which, after federal income tax, would leave an underwriting profit of 4.7%, which, added to "banking profit" of 7% (after federal income tax) would approximate the 12% yield IRB maintained was necessary. Special Counsel maintained that with respect to the lines of insurance here involved, no underwriting profit whatever was needed since the income from the investment of the policyholder-supplied funds was adequate compensation for the underwriting risk.

The public-utility analogue was of course imperfect. The stockholders' investment in an insurance company is not embedded in plant or equipment committed to the supplying of the service or product involved. The funds thus supplied, which are invested in securities selected by the insurer, are not directly used to furnish the service, but rather constitute

a fund to which the policyholders will have recourse if the insurer's underwriting experience involves a loss. The Commissioner concluded that the policyholders should not be concerned with the income, gains or losses from the investment of stockholder-supplied funds. That risk, the Commissioner held, is the stockholders'. And he concluded as well that the risk of capital gain or loss in the investment of policyholder-supplied funds should be the insurer's. Hence the Commissioner held that in fixing a reasonable profit for the insurer, account would be taken only of the income from interest, dividends and rents earned on the funds the policyholders supplied.

But since compensation for the underwriting risk was being sought in terms of a fair return upon the stockholders' investment which must be translated into a percentage of premiums for rate-making purposes, the critical question became what was the needed stockholders' investment to support the total premiums written. IRB relied upon the fact that historically the industry-wide ratio between premiums and net worth was 1 to 1. Special Counsel countered with proof that net worth nonetheless included "surplus-surplus," *i. e.,* assets which exceeded the funds needed to support the insurance business done, and that such "surplus-surplus" was not subject to any real risk. The thrust of his proof was that the appropriate ration of premiums to net worth was 3.5 to 1. The record shows that some substantial insurers operated at or near that ratio. The Commissioner concluded that for rate-making purposes the appropriate ratio of premiums to net worth was 2 to 1, but finding that "surplus-surplus" remained subject to some remote risk, the Commissioner allowed a return upon "surplus-surplus" at a lesser rate.

As we noted above, IRB's stock analysts said a total return of 12% after federal income taxes was needed to attract and retain capital. In reaching that result, they assumed the risk of underwriting loss was high. The Commissioner, however, rejected that premise. He found the fluctuations in the total return upon net worth to which those experts referred

were the result of stock market fluctuations rather than underwriting experience. He pointed out that automobile rates were normally reviewed each year and that automobile loss experience does not change so drastically from year to year. He noted that in New Jersey rating organizations and large independent filers are required to submit rate reviews for private passenger cars at six-month intervals, in each case using experience six months more recent than in the preceding review, thus further reducing the risk of impairment of capital due to inadequate rates.

The Commissioner concluded that an underwriting profit of 6%, after federal income tax, on the capital needed for the insurance business would be adequate without being excessive. As to "surplus-surplus," the Commissioner deemed a return of 1% after federal income tax would be sufficient for the slight risk involved. On the 2 to 1 ratio between premiums and net worth, these two rates were combined to a single rate of 3.5% on premiums after federal income tax. From that sum, there will be deducted, as we have already noted, the after-tax income (other than capital gains) from investment of the unearned premium and the loss reserves. For reasons which appear to be sound, the Commissioner left the amount of that deduction for determination in connection with actual rate filings. The Commissioner added that the insurer enjoys an intangible benefit in the leverage effect the investment of policyholder-supplied funds has on the insurer's portfolio.

It will be noted that the rate of 3.5% upon premiums applies to all insurers without regard to their respective ratios of premiums to net worth, so that an insurer who writes on a ratio of 3 or 4 to 1 will obtain a much greater return on net worth than an insurer who operates on a ratio of 1 to 1. None of the parties questioned this group approach. See *Permian Basin Area Rate Cases,* 390 *U. S.* 747, 769, 88 S. Ct. 1344, 20 *L. Ed.* 2d 312, 337 (1968); 390 *U. S.* at 831–832, 88 S. Ct. 1344, 20 *L. Ed.* 2d at 372 (Douglas, J., dissenting). The apparent basis for an industry, rather than individual, approach is that the insurers are competitive, and that com-

petition should be on the basis of service rather than upon the basis of premiums charged, even though individual insurers remain free to deviate from IRB filings. In any event, the rate-making formula leads to a return upon net worth which will depend upon the quantity of insurance business each insurer chooses to write. Since no one assails that approach, we assume the total circumstances properly persuaded the Commissioner that it is in the public interest.[1]

As we said earlier, both IRB and Special Counsel challenge the Commissioner's Determination. We are satisfied there is no basis for judicial disapproval. In the nature of the subject, the proofs involved some theoretical postulates or assumptions which the Commissioner was not obliged to accept. He could properly bring to bear his expert judgment with respect to those premises and the forecasts which emerged from them. The record provides a substantial basis for his determination. *Garden State Farms, Inc. v. Mathis,* 61 *N. J.* 406, 427 (1972). If experience demonstrates his predictions are wrong, there is a ready vehicle for change.

We think it necessary to add only the following comments with respect to the attack IRB levels at the determination. IRB insists it is arbitrary to use a premium-to-net-worth ratio of 2 to 1 in the light of the industrywide average of 1 to 1. But we cannot say the Commissioner was bound to accept the industrywide average ratio. There is nothing to indicate the industrywide average is the product of a considered judgment to which the insurers subscribed. As we have said, the ratios varied notably among substantial insurers. The record warranted a finding that there is "surplus-surplus," and it was

---

[1] In response to our inquiry at the oral argument, it was said, in part, that the insurer who writes at the higher ratio incurs a larger risk of injury from an underwriting loss and hence should receive the greater return on net worth. But if a greater risk to the carrier is involved, a greater risk is thereby also imposed upon the policyholder, without reduction in the premium charge to him by virtue of that increase in risk. We assume the Commissioner is alert to the policyholder's interest in a safe ratio.

not inappropriate for the Commissioner, in dealing with that phenomenon, to allow a rate of return commensurate with the remote risk to which the surplus-surplus was exposed.

IRB charges that a return of 1% on "surplus-surplus" is confiscatory. It contends the risk of an inroad because of underwriting losses is appreciable. It adds that, to escape that risk, there would have to be massive movement of capital which is infeasible. Moreover, IRB says, *N. J. S. A.* 17:27A-4(c) regulates extraordinary dividends and distributions in a way which would encumber or delay the removal process if it were attempted. But the "surplus-surplus" yields its own return, and is invested as the insurer sees fit. If the Commissioner's findings are accepted that the risk is remote and is adequately rewarded by a profit of 1%, in addition of course to yield from the invested surplus-surplus, there can be no finding of confiscation. The alternative would be the unreasonable proposition that the policyholder must compensate the insurer, not on the basis of the risk the insurer assumes, but on the basis of net worth the insurer chooses to accumulate. Nor is it apparent how the cited statutory regulation as to dividends operates to confiscate the surplus-surplus. If the statute is so applied as to involve that result, it is the statute or its application which will yield.

The determnation is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, Justices JACOBS and PROCTOR, and Judges LEWIS and COLLESTER—5.

*For reversal*—None.