195 N.J. Super. 200 (1984)
478 A.2d 1203
IFA INSURANCE COMPANY, PLAINTIFF-APPELLANT,
v.
NEW JERSEY DEPARTMENT OF INSURANCE, AND THE NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 1984.
Decided July 20, 1984.
*203 Before Judges KING, DREIER and BILDER.
Richard D. Catenacci argued the cause for appellant (Connell, Foley & Geiser, attorneys; Richard D. Catenacci and Daniel J. Pomeroy, on the briefs).
Patrick J. Hughes, Deputy Attorney General, argued the cause for respondent, New Jersey Department of Insurance (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Deborah T. Poritz, Deputy Attorney General, of counsel; Patrick J. Hughes, Deputy Attorney General, on the brief).
William B. McGuire argued the cause for respondent New Jersey Automobile Full Insurance Underwriting Association (Tompkins, McGuire & Wachenfeld, attorneys; Francis X. Crahay and Steven Backfisch, on the brief).
The opinion of the court was delivered by BILDER, J.S.C. (Temporarily Assigned)
On this appeal we are asked to pass on the validity of a requirement that an insurance company have a $5 million policyholder surplus in order to participate as a servicing carrier for the State's revised program for automobile liability insurance for high-risk drivers who cannot otherwise obtain coverage. The requirement is challenged by a carrier, IFA *204 Insurance Company, which wishes to act as a servicing carrier but has only $800,000 in policyholder surplus.
Prior to January 1, 1984 any applicant for automobile insurance who was in good faith entitled to such insurance, but was unable to procure it through ordinary market outlets, was required to seek coverage through the New Jersey Automobile Insurance Plan (AIP). These applicants were members of the "residual" or "involuntary" market because no insurance company was willing to provide coverage to them voluntarily. All insurance companies licensed to transact automobile insurance business in this State were required to be members of the AIP and were required to accept assignments of applicants from the AIP. N.J.S.A. 17:29D-1.
On February 10, 1983 the New Jersey Automobile Full Insurance Availability Act (Act) became law. N.J.S.A. 17:30E-1 et seq., L. 1983, c. 65. This Act provided for the phase-out of the AIP and the creation of a new, involuntary market mechanism known as the New Jersey Automobile Full Insurance Underwriting Association (Association), an unincorporated, nonprofit association established to provide automobile insurance for the residual market through servicing carriers designated to process coverage. The Act mandated that all insurers licensed to transact automobile insurance in this State become members of the Association and be bound by a plan of operation prepared by the Association and approved by the Commissioner of Insurance. Unlike the AIP, wherein all members were required to accept and service residual market applicants, the Act contemplated that Association business would be transacted by a limited number of qualified servicing carriers. To this end, the statute specifically required that the plan establish procedures and minimum standards of eligibility for the selection of servicing carriers. N.J.S.A. 17:30E-6(a). In the absence of qualified volunteers, the Commissioner of Insurance could require one or more members of the Association to act as a servicing carrier if he determined that such action was necessary to effectuate the purposes of the Act. No company having less than one-percent *205 of the private passenger automobile insurance market could be required, under this provision, to act as a servicing carrier. N.J.S.A. 17:30E-12(b).
The board of directors of the Association formulated a plan of operation which was submitted to and approved by the Commissioner of Insurance in July 1983. As required by statute, the plan established minimum eligibility standards for companies seeking to become servicing carriers, one of which was that a prospective servicing carrier have at least $5 million in policyholder surplus. This requirement is the subject of the present litigation. Appellant IFA Insurance Company appeals from a final decision of the Commissioner of Insurance sustaining the requirement.
Although appellant's claims broadly encompass alleged constitutional and antitrust objections, its basic contention is that the $5 million requirement is unreasonable and arbitrary. This claim underlies all of its other contentions. Implicit in appellant's argument is the principle that any constitutional and antitrust assertions fail if there was a reasonable basis for the rule, the $5 million minimum classification.
Despite appellant's arguments to the contrary, we find there is a reasonable and rational basis for the adoption of the $5 million surplus requirement. The Commissioner concluded that a servicing carrier should process a minimum of 35,000 to 50,000 policies to maximize the efficiencies achievable through the use of data-processing capabilities. Because of unreimbursable start-up costs incident to the commencement of the servicing operation and an anticipated time-lag in the payment of reimbursable servicing expenses, the Commissioner projected that the cash-flow drain for a carrier servicing the minimum policy allotment could approach $3 million during the first three months of operation. It was permissible, appropriate and, indeed, prudent to consider the cash-flow problems inherent in start-up costs and reimbursement lag. The relationship of the volume required to achieve these benefits of scale and the *206 cash-flow problem surely could be considered in fulfilling the legislative mandate that minimum requirements be set for the selection of servicing carriers. N.J.S.A. 17:30E-6(a). The surplus that is required to insure that the cash-flow problems will not result in danger to the financial condition of a carrier  or, worse yet, insolvency  was a matter peculiarly within the competence of the Commissioner. He must consider not only the legislative mandate of an efficient system, N.J.S.A. 17:30E-6(a), but the more fundamental goal, to insure the Plan does not impair the financial condition of carriers to the detriment of their voluntary-market policyholders. We hold that the determination of the Commissioner that $5 million is an appropriate surplus is a rational decision.
The appellant vigorously argues that the procedural history of this litigation demonstrates the Commissioner's reasons to be after-the-fact rationalizations. The record is indeed clear that no reasons were given initially and, until required by this court, no hearings were held with respect to the minimum eligibility standards. Appellant's argument, when combined with its contention that an inability to participate in the plan may force it out of business,[1] facially appeals to a sense of fairness. Moreover, we note that appellant is the only applicant to whom this minimum standard is a bar and only is one of four participants in the AIP program whose surplus is below $5 million. However, the critical question is not so much how the Commissioner arrived at his decision, as the rationality of the decision itself. The Commissioner is the expert; he has been invested with the responsibility to make this determination. He must insure the creation of a prompt and efficient program in fulfillment of the legislative mandate. He must insure the protection of the policyholding public and members of the voluntary and involuntary pools alike. The Commissioner is *207 presumed to have expertise in the field of insurance; that expertise must be given great weight by the court. In re Application of Ins. Rating Bd., 63 N.J. 413 (1973); In re Com'r of Bank. v. Parkwood Co., 98 N.J. Super. 263 (App.Div. 1967).
Perhaps appellant could adequately service the Association without risk to its policyholders and participate in what obviously must be a lucrative business, at least in appellant's perception. However, if we ignore the Commissioner's expertise and order a reduction in the surplus requirement, we could be jeopardizing appellant's voluntary insureds. We will not substitute our judgment for the considered opinion of representatives of the Executive Branch who are qualified by training and expertise to make this judgment.
We have also considered appellant's contention that it should be permitted to meet the Commissioner's cash-flow concerns by the use of bank loans. Appellant has offered evidence of its ability to obtain loans for up to 80% of outstanding current receivables due from the Association to be secured by those receivables. Certainly bank advances on the Association receivables would alleviate cash flow problems that might result from a reimbursement lag. Nonetheless, we cannot overlook the fact that the cost of such loans and the creation of a situation wherein the voluntary market policyholders' protection is dependent upon the continued availability of such loans[2] make the acceptability of such a solution a matter within the expertise of the Commissioner.
In passing on an administrative agency's exercise of statutorily-delegated responsibility, we accord it a strong presumption of reasonableness. See Newark v. Natural Resource Coun. Dept. Env. Prot., 82 N.J. 530, 539 (1980), cert. den. 449 *208 U.S. 893, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). We may not substitute our judgment for the wisdom of agency action if that action is statutorily authorized and not arbitrary or unreasonable. Ibid. As long as the action is within the fair contemplation of the enabling statute, that action must be accorded a presumption of validity and regularity. See Motyka v. McCorkle, 58 N.J. 165, 181 (1971). If there is any fair argument in support of the agency's action or any reasonable ground for difference of opinion among intelligent and conscientious officials, "the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal." Flanagan v. Civil Service Dept., 29 N.J. 1, 12 (1959). Where special expertise is required, as in this case, an even stronger presumption of reasonableness exists. See Newark v. Natural Resource Coun. Dept. Env. Prot., supra, 82 N.J. at 540.
We realize that the Commissioner's concerns about cash-flow deals with hypothetical projections. However, we believe the need for the $5 million surplus should be reexamined by the Commissioner after sufficient experience has been gained to test the hypothesis and appellant should be allowed to reapply after that time has passed.
In light of our conclusion that the requirement of a $5 million surplus is reasonable, we find no merit to appellant's contentions with respect to constitutional and antitrust problems. Since the standard is rationally related to the immediate goal of a prompt and efficient mechanism for carrying out the plan and the broader concerns of insuring the financial health of insurance carriers, there is no due process question, see N.J. Chapter Amer. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 601-603 (1967), app. dism. and cert. den., 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967); nor is there a suspect classification which could give rise to an equal protection claim, Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6, 40 (1976), app. dism. 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977). Similarly, the claimed violations of the antitrust laws *209 fail by virtue of statutory exemptions. 15 U.S.C.A. § 1012(b); N.J.S.A. 56:9-5(b)4. Appellant's attempt to avoid these exemptions by a claim of boycott, see 15 U.S.C.A. § 1013(b), is without merit. Appellant's conclusory allegations do not meet the proofs of facially concerted conduct required, see e.g. Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and, in any event, if the Association's conduct could be characterized as an unlawful group boycott, it would be immune under the state-action immunity doctrine. See Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).
Affirmed.
NOTES
[1] Apparently appellant had a share of the AIP market which it feels economically compelled to replace with servicing policies under the Full Insurance Availability Act.
[2] We cannot ignore the fact appellant has a surplus of only $800,000, a mere $200,000 above the statutory minimum required of an insurance company. N.J.S.A. 17:17-6.