599 A.2d 906

IN THE MATTER OF THE COMMISSIONER OF INSURANCE'S MAY 10, 1991 ORDERS REGARDING THE JANUARY 17, 1991 RATE FILING BY THE MARKET TRANSITION FACILITY OF NEW JERSEY.

Superior Court of New Jersey
Appellate Division

Argued October 28, 1991—Decided November 19, 1991.

262

Before Judges PETRELLA, R.S. COHEN and ASHBEY.

*Duane C. Quaini, pro hac vice,* argued the cause for appellant Allstate Insurance Company (*Smith, Stratton, Wise, Heher & Brennan,* attorneys, *Duane C. Quaini, Suzanne M. McSorley* and *William T. Barker,* of counsel and on the brief).

*Carol Johnston,* Deputy Attorney General, argued the cause for respondent (*Douglas S. Eakeley,* Acting Attorney General, attorney, *Joseph L. Yannotti,* Assistant Attorney General, of counsel, *Carol Johnston, Mitchell A. Livingston* and *Bernard Flynn,* Deputy Attorneys General, on the brief).

The opinion of the court was delivered by

COHEN, R.S., J.A.D.

Allstate Insurance Company appeals two orders of the Commissioner of Insurance. The first is the order denying Allstate a role in the proceedings leading to the order setting auto insurance premiums of the Market Transition Facility ("MTF"). The second is the Commissioner's MTF rate order itself. Two other insurers, Aetna Casualty and Surety Company and Liberty Mutual Insurance Company, also appealed the Commissioner's rate order. A–4844–90T5 and A–5298–90T5. Their appeals were stayed on the Commissioner's motion, pending disposition of the present appeal. We reverse the order excluding Allstate from the rate-setting process and order the Commissioner to take immediate action to set proper MTF rates.

The dispute arises out of New Jersey's perennially troubled auto insurance market. The background was thoroughly explored in *State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 590 *A.*2d 191 (1991). *See also In re Assignment of Exposures,* 248 *N.J.Super.* 367, 591 *A.*2d 631 (App.Div.), *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991), and *Allstate Ins. Co. v. Fortunato,* 248 *N.J.Super.* 153, 590 *A.*2d 690 (App.Div.1991). The present case requires us to review some of the history.

In 1983, the New Jersey Automobile Full Insurance Availability Act was adopted. *N.J.S.A.* 17:30E–1 *et seq.* Its principal purpose was to assure access to automobile insurance at standard market rates to qualified persons who could not otherwise obtain insurance. *N.J.S.A.* 17:30E–2. The Act replaced the assigned risk plan, created by *N.J.S.A.* 17:29D–1, with a new residual market mechanism, which came to be called the "Joint

Underwriting Association" or "JUA," and which was to offer policies to drivers rejected by the voluntary market. In the late 1980s, despite periodic legislative efforts to provide financial relief, JUA was in deep financial trouble. Private insurers had steadily reduced their market share, and willingly covered only the best risks. JUA had to take on more and more high-risk drivers, urban drivers, young drivers and others whom the insurers, for good reason or bad, rejected. Ultimately, half of New Jersey's drivers were insured by JUA. The insurers blamed the Commissioner's refusal to permit them to charge sufficient premiums for high-risk private business. The Commissioner consistently denied rate relief. Although many of JUA's insureds were safe drivers, its population included the bulk of the State's worst risks.

JUA was required to cover risks rejected by the voluntary market, but it could charge them no more than standard market premium rates. JUA would therefore suffer losses in the absence of revenue supplements. Additional funds were expected to be raised from bad-driver and accident surcharges imposed by the Division of Motor Vehicles and JUA, and the "residual market equalization charge" ("RMEC"), which was to be laid equally on all autos insured in the voluntary and residual markets except those with principal drivers aged 65 years or older. The RMECs were required to be periodically set by the Commissioner, *N.J.S.A.* 17:30E–8a, at a level that would permit JUA to operate on a break-even, no profit, no loss basis. *N.J.S.A.* 17:30E–3o; *State Farm, supra,* 124 *N.J.* at 41–42, 590 *A.*2d 191; *In re Assignment of Exposures, supra,* 248 *N.J.Super.* at 372–373, 591 *A.*2d 631.

A number of statutory changes took effect in 1988 in an effort to reduce the cost of auto insurance generally, and to reverse the deteriorating condition of JUA in particular. The legislative goal of providing full access to auto insurance at standard rates was modified by permitting JUA to charge bad drivers 10% annual increases for four years. *N.J.S.A.* 17:30E–2, –13a to –13d. There was an optional verbal threshold for

tort actions, *N.J.S.A.* 39:6A–8, –8.1, flex rating for insurers, *N.J.S.A.* 17:29A–44, an insurers' excess profits law, *N.J.S.A.* 17:29A–5.6 *et seq.*, an authorization for JUA to defer payments of bodily injury losses when JUA income is insufficient to meet its obligations, *N.J.S.A.* 17:30E–8.1, a multi-tier rating system for the voluntary market, reflecting the worst risks, *N.J.S.A.* 17:29A–45, and a program for the audit of JUA's servicing carriers to find, recover, and penalize any overcharges made by them to JUA, *N.J.S.A.* 17:30E–17.1.

Most importantly, the 1988 changes provided for the depopulation of JUA over four years, leaving only the least desirable risks for it to cover, *N.J.S.A.* 17:30E–14, and those would be charged self-sustaining, unsubsidized rates. Enough JUA insureds would be periodically assigned to the voluntary market to assure that it would absorb and cover 60%, 70%, 75% and then 80% of the market during the four years of depopulation. *In re Assignment of Exposures, supra,* 248 *N.J.Super.* at 374, 591 *A.*2d 631. The 1988 amendments did not solve the problems.

On March 12, 1990, the Fair Automobile Insurance Reform Act of 1990 ("FAIR Act") became effective. *L.* 1990, *c.* 8. It imposed surtaxes and assessments on the private insurers and fees to be collected from doctors, lawyers and auto body shops. The proceeds were intended to pay JUA's accumulated debt of more than $3.3 billion over a period of time. *See State Farm, supra,* 124 *N.J.* at 42, 590 *A.*2d 191; *Allstate, supra,* 248 *N.J.Super.* 153, 590 *A.*2d 690 (App.Div.1991).

The FAIR Act also abandoned JUA as a residual market mechanism, and created MTF. MTF was to gradually take on the risks whose JUA policies expired after September 30, 1990, and was to issue its own policies for two years, until October 1, 1992. During that time, the MTF population would be reduced, if necessary by periodic assignments of risks to insurers who did not voluntarily take on their share, to 32%, 29%, 20% and, finally 10% of the market. The 10% residuum of rejected risks

would be relegated to the old assigned risk plan. *N.J.S.A.* 17:33B–11c(5); 17:29D–1.

MTF's initial premiums were to be based on JUA's insufficient September 30, 1990 rates. However, its short revenues, unlike JUA's, would not be supplemented with RMECs, surcharges, assessments and professional fees. (RMECs and policy constants had grown to about a third of all JUA revenues.) MTF's profits and losses would be apportioned among the auto insurers. *N.J.S.A.* 17:33B–11d. *In re Assignment of Exposures, supra,* 248 *N.J.Super.* at 375, 591 *A.*2d 631.

When private insurers took on JUA/MTF risks as part of the depopulation program, they could charge them their ordinary premium rates, or, if they chose to do so, they could charge MTF rates. *N.J.S.A.* 17:33B–12. MTF rates were higher then those of many insurers, including Allstate. In May 1991, when the Commissioner was considering MTF's rates, we heard insurers' objections to the Commissioner's January 1991 depopulation order on the ground that their premiums were too low for the new business. *In re Assignment of Exposures, supra,* 248 *N.J.Super.* 367, 591 *A.*2d 631. We concluded that the insurers' opportunity to use MTF rates for depopulation business meant that they were not being forced to take on hundreds of thousands of new, higher risks at voluntary market rates.[1] We said:

> Current MTF rates are higher than the current voluntary market rates of Aetna and Allstate, and, we assume, also of Colonial Penn. In addition, MTF rates will be supplemented for substandard drivers who are still eligible for assignment. The supplement may not be as great as the insurers think will be necessary, but that is very difficult to evaluate now. Moreover, MTF has already applied to the Commissioner for a 28% rate hike, approval of which would further increase premium levels. Not enough, say the insurers, pointing out that MTF has announced that its rates need a 60% increase to permit MTF to break even; insurers are entitled to earn a profit, and MTF's break-even

---

[1]Allstate was assigned some 30,000 policies in the January 24, 1991, depopulation order. It says it will be required to accept an additional 270,000 exposures to meet its remaining depopulation obligations.

rates are therefore inadequate by definition. [248 *N.J.Super.* at 389, 591 *A.2d* 631].

We ultimately concluded:

The insurers will be able to charge the recently enhanced MTF rates to their assigned exposures. That creates a better situation than was predicted for the insurers at the time of their briefs and oral arguments. Whether it is better enough would no doubt be the subject of some disagreement. We are in no position, however, to predict whether that untested new business taken on by the insurers from MTF at untested new MTF premium rates will result in future losses so clear and significant that the insurers are entitled to protection in advance. [248 *N.J.Super.* at 390, 591 *A.2d* 631].

MTF began issuing policies and charging premiums on October 1, 1990. The FAIR Act required it initially to use JUA rates, with a few exceptions and variations. *N.J.S.A.* 17:33B–11c(2). The Commissioner had the authority, however, to raise rates. *N.J.S.A.* 17:33B–11c(3). It must have been apparent to the Commissioner, as the operator of MTF, that the JUA rates were too low. They were so low in the late 1980s that even cash-flow accounting, RMECs, bad-driver increases and other revenue enhancers did not prevent dramatic yearly deficits. The anticipated greater accountability and efficiency of MTF, limitation of generous policy benefits, and other cost containment measures could be expected to accomplish just so much. The loss of RMECs would be a tremendous loss of revenue, and there were no means provided in the FAIR Act to subsidize residual market premium rates.

In November 1990, MTF received the reports of two actuarial consulting firms which had been retained to study the appropriate level of MTF rates. One firm, Milliman & Robertson, Inc. ("Milliman") had been retained by the Department of Insurance itself, through MTF. The other, William M. Mercer, Inc. ("Mercer") had been brought in by the insurance industry through the MTF Advisory Board's Actuarial Committee. (The Advisory Board is a statutory body without operational authority whose members are appointed by the Commissioner of Insurance, largely from the insurance field. *N.J.S.A.* 17:33B–11b.)

The conclusions of the two reports were quite similar. Milliman estimated that overall MTF rates were "deficient by 62.-2%" on the day it opened for business: liability coverages were 97.7% low, and physical damage coverages were 6.0% low. Mercer concluded that the MTF deficiency was 58.0%, with liability coverages 88.5% low, and physical damage coverages 7.5% low.

Although the actuarial consultants both reported in the first half of November 1990 that MTF rates were grossly inadequate, the Special Deputy Commissioner of Insurance in charge of MTF did not ask the Commissioner for higher rates until January 17, 1991, when he formally submitted his "Filing for Rate Revision." The Commissioner studied the matter for another four months, and made his decision on May 10. MTF had by then been operating for more than 7 months with rates that were plainly and obviously too low. The Attorney General represented at oral argument that the only communications between the Commissioner and his Deputy on the subject were the official January 17 application for premium increases and the Commissioner's May 10 response. The reason we were given was that the Commissioner wanted to avoid the appearance of impropriety.

The Deputy did not apply for the 62% or 58% increase the actuarial consultants said was necessary. Instead, he asked for an overall additional 28%. He did not tell the Commissioner he thought that an additional 28% would be enough to break even. Instead, he said:

> The reason it is less than the indicated need is that any other amount would have required a large increase that would have impacted the clean driver.

Along with his "Filing," the Deputy sent copies of the two actuarial studies and a letter from the MTF Actuarial Committee describing the consequences of insufficient MTF premium rates. As far as we know, there were no other materials sent to the Commissioner. His review consisted of analyzing the reliability of the assumptions, methodologies, and conclusions of the actuaries. The Commissioner had no countervailing

information that we know of, except what little he mentioned in his opinion.

In March, while the Commissioner was studying the materials submitted to him, Allstate applied for leave to intervene, only to file a brief urging that the requested 28% was not enough. It cited Administrative Code rules permitting interested parties to intervene in "contested cases." *See N.J.A.C.* 1:1–16.1 *et seq.* It said it was prepared to rely on the record provided by the actuarial reports and the January 17 letter of the Deputy; it would seek to present additional evidence only if the record was to be supplemented or expanded.

The Commissioner denied Allstate's application, but only on the day he made his rate determination. He said that there was no "contested case," and therefore Allstate's reliance on rules for intervention in contested cases was misplaced. He said that setting MTF rates was part of his authority as the operator of MTF, and was not the occasion for an adversary proceeding. He further stated that the proposed intervention "would delay an expeditious decision," and that the MTF Advisory Board requested that there be no delay, but that Allstate's application for higher MTF rates proceed independently at Allstate's expense.

The Commissioner issued a 25–page opinion explaining his disposition of MTF's filing. The opinion first dealt with physical damage coverage premiums, which the consultants had evaluated as 6% (Milliman) and 7.5% (Mercer) too low. The Commissioner found that both evaluations were based on unrealistic assumptions about the pace of MTF depopulation. On the basis of the first six months of operation, the Commissioner found that depopulation was proceeding more slowly than the actuaries had predicted. He apparently assumed that the first drivers to leave MTF in the depopulation were the lowest risk drivers; thus, slower depopulation dampened the rise in average risk levels for the drivers still covered. Mercer shared this assumption. Milliman did not.

The Commissioner had additional concerns: Milliman's predicted loss trends of about 10% for collision and comprehensive coverages were too high; the use of JUA loss figures was misleading. At the bottom line, the Commissioner concluded that the actuaries' predicted deficiencies in physical damage premiums should be reduced to –3% for collision and 6.7% for comprehensive coverage.

The actuaries' liability coverages deficiency estimates were:

| | MERCER | MILLIMAN |
| --- | --- | --- |
| Bodily Injury | 77.5% | 93.9% |
| PIP | 177.0% | 173.0% |
| Property Damage | 35.5% | 31.2% |
| Overall | 88.5% | 97.7% |

The Commissioner concluded that these numbers were too high because depopulation was slower than expected, because Milliman's loss trend rates were too high, and because MTF proposed certain changes that would cost money and which the Commissioner had disapproved.[2] The Commissioner stated that the actuaries' predictions had to be adjusted for their forecasting inaccuracies. Without identifying the magnitude of the inaccuracies, he reduced the overall Mercer estimate from 58% to 51.5% and Milliman's from 62.2% to 43.3%. The average of the two was 47.4%.

The rating plan which the Commissioner approved would produce an 18.6% increase in MTF revenues. Adjustments in the rating plan would produce further revenues which the Commissioner did not estimate, but he ultimately recognized that the actuarial evaluations appeared to indicate the need for an additional 24.3% to break even. He then commented:

> Critics of this decision probably will use the two MTF actuarial studies to claim that the Department has underfunded the MTF deliberately. There are several reasons, however, to question whether the actuarial estimates of the MTF rate needs are accurate.

---

[2] The relevance of this information is not clear, since the actuaries did not base their November 1990 projections on changes MTF proposed in January 1991 for adoption some months later.

Again, the Commissioner questioned the use of JUA data to forecast MTF results: lower benefit payouts could be anticipated, along with more efficient operations and lower costs resulting from differences in the mix of JUA and MTF insureds in the smaller share of the insured population covered by MTF. The Commissioner did not say why the smaller share should result in lower-than-anticipated deficits. Indeed, if the smaller share results from early depopulation of the better drivers, as he earlier posited, the smaller share would have a greater component of higher risks.

Finally, the Commissioner expressed his Department's "commitment to operate the MTF on a no profit, no loss basis," and stated that MTF had "ample time to make another rate application ... if its financial results are as poor as the actuaries are predicting." He continued:

> If the MTF certifies or the Department staff determine that the actual results are significantly worse than the previously projected values, this information will be viewed by the Commissioner as an "early warning" of a potential MTF rate deficiency. The Commissioner, upon receiving a quarterly report showing significant deterioration in the MTF financial results, will order the MTF to prepare an actuarial evaluation of its rate needs that will serve as the basis for approving an appropriate MTF rate increase.

The Commissioner therefore told MTF to provide him with quarterly statements of its financial position, including actual current results as well as projections for future quarters, showing income, expenses, loss payments, loss reserves, and cash flow.

Evaluation of the Commissioner's rate order and refusal to let Allstate participate has to include an analysis of the differences between MTF and its predecessor, JUA. JUA was an unincorporated non-profit association of all New Jersey auto insurers. N.J.S.A. 17:30E-4. It had a board of directors of 17 members,[3] 14 appointed by the Governor, one each by the President of the Senate and the Speaker of the Assembly, and, ex officio, the Director of the Division of Motor Vehicles. The

---

[3]Later reduced to 9 members. L. 1988, c. 119, § 17.

insurance industry was well represented on the Board, *N.J.S.A.*
17:30E–5a. It was to adopt a plan of operation, subject to the
Commissioner's approval. *N.J.S.A.* 17:30E–6. JUA was grant-
ed broad operating authority, to be exercised by the Board and
a general manager who reported to the Board and not to the
Commissioner.[4] *N.J.S.A.* 17:30E–7. The Board was sufficient-
ly independent to litigate with the Commissioner over the
imposition of RMECs. *See New Jersey Auto. Full Ins. Under-
writing Ass'n v. Gluck*, No. A–4870–84T1 (App.Div. June 19,
1986). JUA's sources of income have already been described,
as has its express obligation to operate on a break-even basis
by the exaction of sufficient RMECs from the policyholders.
The insurers were not responsible for JUA losses.

The JUA statute has a detailed provision for mandatory
hearings to be conducted by a panel of the Board on the request
of a member insurer aggrieved by a ruling of JUA, or its
failure to adhere to its plan of operation, or to the enabling
statute. The Board's ruling was appealable to the Commission-
er and then to this court. *N.J.S.A.* 17:30E–16.

MTF's statute is different. *N.J.S.A.* 17:33B–11 creates MTF,
"to be operated by the Commissioner of Insurance pursuant to
the provisions of this section." It does not describe MTF as an
unincorporated non-profit association of auto insurers or any
other kind of entity. It merely says the auto insurers shall be
members of MTF "and shall share in its profits and losses."
*N.J.S.A.* 17:33B–11a. There is no board of directors or general
manager reporting to it, but only an advisory board. *N.J.S.A.*
17:33B–11b. There is no express provision for rate subsidies or
break-even operation, or for hearings at the request of an
aggrieved insurer. There is no person or board empowered to
confront the Commissioner regarding MTF operations.

---

[4] In 1986, the Legislature declined to enact a proposed amendment to have
the general manager report to the Commissioner instead of the Board.

JUA was structured as an entity with a chief executive and board of directors who functioned somewhat independently. The consumers' and the insurers' interests were protected by representation on the Board. Premiums were set by the voluntary market. The Commissioner had ultimate financial control because the imposition of RMECs was his responsibility. He had the obligation, however, to set the RMECs high enough to cause JUA to operate on a no profit, no loss basis. *N.J.S.A.* 17:30E–3*o.* The point is that, with that very significant exception, JUA was not the Commissioner's direct responsibility.

MTF, on the other hand, is the Commissioner's operation. He may, of course, designate subordinates for day-to-day functions. The Commissioner is not, however, a neutral sometime referee for an insurance mechanism operated by others. As the Commissioner said in rejecting Allstate's motion to intervene:

The Legislature directed that the MTF is "to be operated by the Commissioner...." Thus the determination fixing rates for MTF is a matter solely within the scope of the Commissioner's powers.

The other salient difference between JUA and MTF is the matter of deficits. The Legislature told the Commissioner to see to it that JUA broke even. It did not contemplate that he would not do so; it provided no means to pay a deficit. Only later, after JUA ran up a $3.3 billion deficit, was legislation enacted to deal with it.

The FAIR Act does not expressly require MTF to be a break-even operation, but the law cannot be otherwise. If there were no such requirement, the Commissioner could purposely set rates high enough to yield a profit, which he could then distribute to the member insurers. There is, however, nothing in the text or purpose of the FAIR Act that entitles the Commissioner to operate MTF to make a profit. It is unthinkable, not only as a matter of policy but also as a matter of law, that the Commissioner might plan such a windfall for insurers at the expense of policyholders.

It is equally unthinkable to suggest that the Commissioner could decide, as a matter of policy, to select deficit rates, and later send apportioned bills to the member insurers. The statute does not expressly confer such a power to tax the insurance companies. There is no obvious method for them to pass the cost on.[5] The Commissioner did not argue in his May 10, 1991 opinion or before us on appeal that he has such authority. Indeed, he expressed his "commitment to operate the MTF on a no profit, no loss basis...."

When the Legislature wanted to impose financial burdens on the insurance companies in the FAIR Act, it knew how to do so in plain terms. For example, it levied assessments and surtaxes designed to pay off JUA's accumulated debt. *N.J.S.A.* 17:30A–8a(9) and (10), 17:33B–49. The assessments cannot be passed along, dollar for dollar, to the policyholders. *N.J.S.A.* 17:30A–16b. Also, the Commissioner is to ensure that policyholders do not pay for the surtax. *N.J.S.A.* 17:33B–51. In *State Farm*, the Supreme Court read the FAIR Act to bar direct pass-throughs of assessments and surtaxes, but said they were not unlawful on their face, on the assumption that the Commissioner would fulfil his duty to see to it that the insurers would receive a constitutionally fair overall rate of return, *see Sheeran v. Nationwide Mut. Ins. Co., Inc.*, 80 *N.J.* 548, 560, 404 *A.*2d 625 (1979), and that he would act in a realistic and timely manner consistent with that statutory duty. *State Farm, supra*, 124 *N.J.* at 62–63, 590 *A.*2d 191.

The Commissioner does not make the argument that prevailed in *State Farm*. He does not contend that the statute authorizes him to run MTF at a loss to the insurers, with the insurers' right to a fair return authorizing them to pass along the costs only if necessary to prevent an unconstitutional taking. In his opinion, the Commissioner expressed his "commit-

---

[5]We were told at oral argument that the Commissioner does not plan to send bills to the insurers until 1993. It is not clear exactly how they would be able to recoup the expenses at that late date.

ment to operate the MTF on a no profit, no loss basis." In his brief before us, he describes his "dedication" to that proposition "in fulfillment of his perception of the legislative intent."

The question before us is not the one decided in *State Farm.* There, it was clear that the Legislature had imposed financial burdens on the insurers, and the Supreme Court had to determine the constitutionality of the imposition. Here, the question is whether the Legislature, by saying that the insurers share MTF's profits and losses, but without any operating role, has authorized the Commissioner to set MTF rates at a loss-producing level. Although he does not argue that he has that authority, it is useful to rule clearly that he does not.

We defer to reasonable exercises of administrative agency expertise. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). We recognize the Insurance Department's familiarity with the operations of the auto insurance market. *IFA Ins. Co. v. New Jersey Dep't of Ins.,* 195 *N.J.Super.* 200, 206–07, 478 *A.*2d 1203 (App.Div.), *certif. denied,* 99 *N.J.* 218, 491 *A.*2d 712 (1984). We do not have to deal, however, with a contested agency interpretation of its enabling statute. *See Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 527 *A.*2d 843 (1987). And that is because the Commissioner's view coincides with Allstate's and our own: his duty is to operate MTF on a break-even basis. We repeat that there is no disagreement on that score, and no contention that the insurers must pay up and hope for later rescue in a constitutional safety net.

When the Commissioner sets MTF rates, it is not necessary for him to act as a neutral adjudicator of his Deputy's presentations or even of cases made by opposing parties. That is the Board–of–Public–Utilities model, and it does not fit very well. The Commissioner is the chief executive and operating officer of MTF, and he chose a Deputy to run it on a daily basis. The Commissioner surely has no need to avoid discussing rates with his Deputy to avoid the appearance of impropriety. The Deputy is his subordinate, and runs MTF in his name. That

does not mean, however, that the Commissioner may set MTF rates in a closed-door process from which those affected are completely excluded.

The March 12, 1990 statute directed the Commissioner to adopt procedures for "the filing and approval of changes in [MTF] rates ..." *N.J.S.A.* 17:33B–11c(3). He did not do that. If he had done so, he might have followed the BPU model, at least to the extent of erecting the framework for an adversary process that included plenary presentation of evidence. He might instead have followed the rule-making model, in which he would have published proposed rates and subjected them to public scrutiny and comment by affected parties before deciding whether to adopt them. *See State, Dep't of Envtl. Protection v. Stavola,* 103 *N.J.* 425, 511 *A.*2d 622 (1986); and see Justice Handler's dissent, *id.* at 439, 511 *A.*2d 622; *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 478 *A.*2d 742 (1984). We call the Commissioner's attention to *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 426 *A.*2d 1000 (1981), *appeal dismissed,* 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981), and particularly to Justice Handler's concurring opinion, *id.* 85 *N.J.* at 337, 426 *A.*2d 1000.

The intersection between agency adjudication and rule-making functions is, as the cited cases show, not always an easy one to locate. It is not for us to make an initial determination whether one process or the other is more suitable, or even exclusively suitable, to deal with MTF ratemaking. What can safely be said, however, is that some process must be devised and employed that will take adequate account of the fact that MTF ratemaking decisions dispose of hundreds of millions of dollars of somebody else's money. Such decisions cannot be made behind closed doors, out of the sight of the people affected and without the benefit of any input from them.

Since the Commissioner did not follow the statute's direction to adopt procedures for MTF ratemaking, we have no opportunity to evaluate adopted procedures. It would, however, be

inappropriate for us to select a particular path for the Commissioner to follow. There are many possibilities, and it is for him to choose among them. The problem is that time is passing rapidly and, perhaps, irretrievably.

In his May 10 rate order, the Commissioner said that monitoring actual MTF operations would permit him to see if the actuaries' forecasts were accurate or, as he then believed, unduly pessimistic. If they were accurate, he could consider raising MTF rates. It is now thirteen months since MTF opened for business, and six months since MTF's rates were raised 18.6%. The first quarterly report the Commissioner asked his Deputy for will not, we are told, be ready until late December. And, that is not a firm date. We are not intimately familiar with the Department's records of MTF operations. We are unaware, however, of any actions being taken by the Commissioner to test the validity of his May 10 skepticism regarding the actuaries' forecasts. It is apparent that an immediate and assiduous search for guidance in the available records of MTF experience would enable the Commissioner to better evaluate his May 10 forecasts and the actuaries', and to make appropriate plans for the future.

The Commissioner is faced not only with the possibility of creating tremendous MTF losses by permitting operations at insufficient rates, but also the possibility of creating additional losses for private insurers on voluntary business written at MTF rates for depopulated risks. And yet, the timetable he set in his May 10 order for "early warning" of potential deficits depended on quarterly reports from MTF, the first one of which is not expected to be complete until late December. Then, the Commissioner may order MTF "to prepare an actuarial evaluation of its rate needs", and then a rate increase will be considered. The problem, of course, is that the time for charging increased premiums grows shorter every day, and will soon disappear altogether. We note that the Commissioner had the duty to approve or disapprove a JUA filing for increased

RMECs within 60 days. Inaction constituted an approval. *N.J.S.A.* 17:30E–8b.

■ Rate hikes are prospective only. *In re Petition of Elizabethtown Water Co.*, 107 *N.J.* 440, 452–60, 527 *A.*2d 354 (1987). There is no way for MTF or voluntary market insurers to charge retroactively higher premiums for earlier policy periods. Thus, the continued inadequacy of MTF rates, if indeed they are inadequate, would constitute a continually increasing loss that could never be made up. In these circumstances, all practical speed is the only acceptable pace for appropriate proceedings for review and evaluation of MTF rates. It may not be possible to make definitive judgments about MTF's predicted losses, but there are enough problem indications to require the Commissioner's immediate attention. He must determine if losses are and will be sustained at present premium levels. If so, he must determine what increases to direct in order to operate MTF on a breakeven basis. The Commissioner can not responsibly wait for sufficient information to be absolutely sure. If he were operating MTF with public funds, it would be unthinkable for him not to keep a constant eye on the bottom line. He owes no less to the insurance companies.

We have considered denying any present relief, and relegating the insurers to whatever defenses they may later assert if the Commissioner bills them for MTF losses. Since the bills would come so late in the day, the result of relieving insurers of their burden would be serious. The legislation contemplates no alternate source of MTF subsidy. The question whether MTF is something other than a part of the Insurance Department, financed by general tax revenues, would obviously be a focal issue.

We suggest no answers to any of these questions. In particular, we do not say whether the insurers could avoid MTF bills if they could prove that the Commissioner knowingly ran MTF at a loss, or what the alternate source of funds would be. We say only that there are no happy answers to such questions,

and that only immediate attention by the Commissioner can lessen their impact.

We also express no opinion on the Advisory Board's suggestion that Allstate could independently and at its own expense apply to the Commissioner for an MTF rate increase. It has not attempted to do so, and we have no occasion to deal with the possibility.

■ The manner of proceeding to consider and determine MTF rates will forthwith be chosen by the Commissioner. The proceeding must afford interested parties a voice and reasonable advance access to the relevant information in the hands of the Department of Insurance. The Commissioner must act speedily. Proceedings conducted at a leisurely pace can consume many months and confirm the insurers' suspicion that the Commissioner is in no hurry to look realistically at MTF rates. Recognition of the fact of regulatory lag will excuse only delay that is absolutely unavoidable. *Helmsley v. Borough of Fort Lee,* 78 *N.J.* 200, 226–30, 394 *A.*2d 65 (1978), *appeal dismissed,* 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979).

■ We order the Commissioner to meet with representatives of interested parties [6] within 15 days of this opinion to fix a manner and a time schedule for the accomplishment of the purposes identified in this opinion. We expect him to establish a brief timetable for preparation, a forthcoming response to legitimate demands for relevant Department records, and a procedure suited to the protection of the rights of all interested parties.

---

[6]Policyholders are also interested parties. Perhaps the Public Advocate might represent them. *See N.J.S.A.* 52:27E–18. The authority of the Division of Rate Counsel seems broad enough to include such an undertaking.