ALLENDALE FIELD AND STREAM ASSOCIATION, AN UNIN-
CORPORATED ASSOCIATION OF THE STATE OF NEW
JERSEY, RESPONDENT, v. LEGALIZED GAMES OF
CHANCE CONTROL COMMISSION, APPELLANT.

Argued October 8, 1963—Decided December 2, 1963.

*Mr. William W. Evans, Jr.,* argued the cause for respondent (*Messrs. Evans, Hand, Evans, Allabough & Amoresano,* attorneys).

*Mr. Alan B. Handler,* Deputy Attorney General, argued the cause for appellant (*Miss Marilyn H. Loftus,* Deputy Attorney General, of counsel; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J.   The Legalized Games of Chance Control Commission (herein Control Commission) held that Allendale Field and Stream Association (herein Allendale) was not qualified for a license to conduct a raffle.   Under the statute, as we shall later point out, a license may be issued only by a municipality.   The Control Commission here made its determination when Allendale applied to it for registration, which, under the Control Commission's rules, is prerequisite to an application for a license.   The Appellate Division reversed, holding that the Control Commission could not consider Allendale's eligibility except upon an appeal from a municipal refusal to license.   *Allendale Field & Stream Ass'n v. Legalized Games of Chance Control Comm'n*, 76 *N. J. Super.* 313 (*App. Div.* 1962).   We granted the Control Commission's petition for certification.   39 *N. J.* 237 (1963).

## I.

In 1953, *Art.* IV, § VII, *par.* 2 of the State *Constitution* was amended to permit the playing at games of chance known as "bingo" and "raffles" in municipalities in which a majority of the voters should approve of such gambling.

The amendment sought in several ways to guard against the obvious evils which could invade the field.   First, it limited the operators to "bona fide veterans, charitable, educational, religious or fraternal organizations, civic and service clubs, volunteer fire companies and first-aid or rescue squads."   Second, it required "the entire net proceeds" of the game to be devoted to purposes more limited than the total purposes for which some of the described organizations could be formed; the entire net proceeds must be devoted to "educational, charitable, patriotic, religious or public-spirited uses."   And third, the amendment expressly preserved the legislative power to provide restrictions and controls from time to time.

Upon the adoption of the amendment much attention was given to the subject of effective control in this delicate area.

The Governor constituted a committee to study the problems and to prepare drafts of appropriate legislation. The committee submitted its report (January 15, 1954) in which it said in part (*p. 2*):

"4. We believe that only the essential rules should be contained in the statute, and that for the details broad rule making power should be assigned to a board to be appointed by the Governor with the advice and consent of the Senate. No one can foresee with much assurance just what undesirable situations will arise in relation to bingo and raffles, what form they will take and how best to remedy them. A regulatory board has been provided for to serve as a means of gathering accurate information not now available. It can constantly watch the situation as it develops and will be able to take such measures from time to time as circumstances require, and to recommend such legislation as may seem necessary."

The Legislature did not adopt the bills as formulated by the Governor's committee, but it did embrace the same principle that the Control Commission should have broad powers to supervise and regulate. *N. J. S. A.* 5:8–6 accordingly provides:

"It shall be the duty of the commission to supervise the administration of the Bingo Licensing Law and the Raffles Licensing Law and to adopt, amend and repeal rules and regulations governing the issuance and amendment of licenses thereunder and the holding, operating and conducting of games of chance under such licenses * * * which shall have the force of law and shall be binding upon all municipalities issuing licenses under either or both of said laws and upon all licensees thereunder * * * to the end that such licenses shall be issued to qualified licensees only and that said games of chance shall be fairly and properly conducted for the purposes and in the manner in said laws prescribed and to prevent the games of chance authorized to be conducted by said laws from being conducted for commercial purposes instead of for the purposes authorized in said laws, and in order to provide uniformity in the administration of said laws throughout the State, the commission shall prescribe forms of applications for licenses, licenses, amendment of licenses, reports of the conduct of games and other matters incident to the administration of said laws. * * *"

The Control Commission adopted rules and regulations, which it filed with the Secretary of State pursuant to *N. J. S. A.* 5:8–7. They require every organization to "register

with the Control Commission and secure an identification number" before filing an application for a license with the municipality (Part II, § 1). The rules state that neither registration nor the assignment of an identification number shall constitute evidence of eligibility for licensure (Part II, § 5).

Allendale applied to the Control Commission to be registered and to be assigned an identification number. It was upon that application that the Control Commission, after a hearing, concluded that Allendale did not qualify and hence would not be registered. The Appellate Division, as we have already said, held the Control Commission could not pass upon eligibility except on an appeal from a municipality's refusal to license.

The issue is whether the statutes empower the Control Commission to make an initial determination of eligibility. The Control Commission stresses its rule-making authority and the rules adopted thereunder. The questions, in inverse order, are whether the rules contemplate such initial decision, and if they do, whether the rules exceed the statutory grant of power.

As to the first question, the rules do state that registration shall not evidence eligibility, but that provision is not decisive since it is consistent with the thought that the Control Commission may but need not screen out an ineligible organization at that stage. It would seem odd to register organizations which are palpably unqualified and to delay the exercise of the agency's ultimate power until local government had gone to the trouble of deciding the question.

The rules could be clearer in this regard, but we do not doubt the Control Commission intended to reserve the discretionary authority to hear and decide an issue of eligibility at the registration stage if the application for registration or other circumstances suggested a sufficient doubt. That the Control Commission so construed its rules is evident from the annual reports which it submitted to the Governor and the Legislature pursuant to the mandate of *N. J. S. A.* 5:8–23.

In its report for 1955 the Control Commission said that in that year, its first year of operation, "many organizations were registered which [were] subsequently found to be unqualified" (*p.* 1). It explained that many municipalities erroneously construed registration to establish eligibility and "It therefore became necessary to adopt a stricter policy in accepting registrations of organizations in an effort to screen out unqualified organizations at the inception" (*pp.* 1–2).

In its report for 1956 the Control Commission said "some Governing Bodies of Municipalities are still misinterpreting the registration of an organization to be tantamount to a finding by the Commission that the organization is qualified to conduct Games of Chance, although this misinterpretation is decreasing" (*p.* 2). The report noted the primary responsibility rests with local government but "to assist Governing Bodies the Control Commission has carried on a policy of screening organizations when applications are submitted for registration" (*p.* 2).

The report for 1957 repeated that the Control Commission assists local government by carrying out "a policy of screening organizations when applications are submitted for registration" (*p.* 2), and added that during that year it held 56 hearings some of which involved "qualifications of organizations" (*p.* 3).

In its Interim Report of November 17, 1958 the Control Commission said its activities included investigations "to determine the qualifications of an organization when it applies for an identification number" (*p.* 4), and speaking of the work of its secretary with respect to applications for registration, the report continued (*pp.* 4–5):

"* * * These requests fall into three categories. The first category is those that are obviously qualified such as Churches, Volunteer Fire Companies and Veterans Posts. The second category are those that are obviously not qualified such as purely social organizations or political organizations. The third category is a field in between the first two. If the evidence that is submitted does not show that an organization is qualified, the organization will be turned down. Organizations that are turned down then have a right

to request a hearing before the Commission which reviews the action of the Secretary and which hears members of the organization involved."

■ Thus the Control Commission consistently construed its rules to permit a hearing as to eligibility upon an application for registration. We see no reason to question its interpretation of its own rules, especially since Allendale was in nowise misled and was in fact accorded a full hearing.

The remaining question then is whether the Control Commission exceeded its statutory power.

*N. J. S. A.* 5:8–6, quoted above, casts upon the Control Commission the duty to supervise the administration of the statute and to adopt rules and regulations relating to the issuance of licenses "to the end that such licenses shall be issued to qualified licensees only." The task of weeding out ineligible organizations is formidable. In the first year of operation, 4,690 organizations were registered (report for 1955, *p.* 1). The Control Commission could well conclude the job should not be left to the myriad views and varying capacities and energies of hundreds of municipalities. Indeed the report for 1956 noted that "The complaint heard most stems from municipal clerks who feel that the games of chance laws should be administered solely by the Control Commission," a proposal the Control Commission declined to approve (*p.* 5). And the 1962 report (*pp.* 6–7) noted without comment that in the years 1959, 1960, and 1961 there was not a single instance in which a municipal governing body instituted proceedings for violation of these laws or questioned the use of the proceeds by an organization.

We think the granted power to supervise and to adopt rules and regulations amply supports the Control Commission's assertion of authority to require registration and to weed out ineligibles in that process. That power must therefore be found unless there are other provisions in the statutes which reveal a contrary intent. Allendale says there are.

■ Allendale refers to the provisions for licensure upon application to the municipalities and for investigation and

decision thereon at that level (*N. J. S. A.* 5:8–26 and 27; 5:8–52 and 53). No doubt the municipality is the licensing authority, but a power in the Control Commission to screen out ineligibles is consistent with the role thus given to local government. Indeed the Governor's committee, while recommending local responsibility for licensure as against the alternative of a single state-wide licensing agency with all of the burdens that approach would entail (*p.* 3), nonetheless recommended the completely compatible proposition that the state agency have the maximum power to do what need be to achieve the legislative goal.

Nor can we accept the thesis next advanced that since the statutes provide for an appeal to the Control Commission from a municipal denial of an application (*N. J. S. A.* 5:8–11; 5:8–39 and 66), it must follow that the Control Commission's role as to eligibility was intended to be appellate only. That the Legislature did not thereby intend to confine the Control Commission to an appellate role seems clear from the fact that while the cited sections provide also for an appeal from a suspension or revocation by local government, yet the statutes expressly authorize such original disciplinary action by either the municipality or the Control Commission (*N. J. S. A.* 5:8–30 and 57; see also 5:8–8, 9 and 10). Thus the Legislature intended the state agency to act both initially and as an appellate body with respect to suspensions and revocations. We see no reason to suppose the Legislature ordained only an appellate role as to the equally critical subject of compliance with the requirements for eligibility for licensure. We add that, in harmony with this thesis, the cited statutes relating to an appeal permit a new or an enlarged record before the Control Commission, thus affording an organization the same original decision by the Commission whether the proceedings start there or at the municipal level.

These statutory provisions are consistent with the sensible thought that while local government is enjoined to be vigilant, the Control Commission holds the ultimate responsibility and powers equal to it. The screening of appli-

cants by the Control Commission is well calculated to achieve the statutory aims with no unfairness to an applicant. We should, liberally construe the acts to permit the agency to achieve the task assigned to it, and should imply, if need be, incidental powers reasonably adapted to that end. *Cammarata v. Essex County Park Comm'n*, 26 *N. J.* 404, 411 (1958); *Bechler v. Parsekian*, 36 *N. J.* 242, 249–51 (1961). And the view we take seems fortified by the circumstance that the Control Commission explicitly informed the executive and legislative branches of its understanding of its authority in its statutory reports mentioned above, and so far as we know, neither branch has questioned the Commission's view.

## II.

This brings us to the merits of the controversy, which the Appellate Division did not reach because of the position it took upon the issue discussed above.

As we noted earlier, the Constitution states the qualifications of an organization and then requires the net proceeds to be used for specified purposes, eligibility being limited to *bona fide* veterans', charitable, educational, religious or fraternal organizations, civic and service clubs, volunteer fire companies, and first-aid or rescue squads, while the entire net proceeds from the games of chance must be devoted to educational, charitable, patriotic, religious, or public-spirited uses.

The statutes follow the Constitution literally in specifying the organizations which may conduct the games and in prescribing the purposes to which the net proceeds must be devoted. *N. J. S. A.* 5:8–25 and 51. The statutes require that upon application for licensure there shall be explored both the nature of the organization and the identity of the expected use of the proceeds. *N. J. S. A.* 5:8–26 and 27; 5:8–52 and 53. The reason for an inquiry at that stage as to the use of proceeds is doubtless to head off illegal expenditures, but probably also to cast light upon the nature and *bona fides* of the applicant itself. In a practical world an

organization is better known by what it does and plans than by the sound of its constitution. Hence the rules and regulations of the Control Commission require the applicant to show it "(2) has actively engaged prior to its initial application for a license in serving one or more of the authorized purposes in this State; and (3) has received and used and in good faith expects to continue to receive and use funds from sources other than the conducting of games of chance for the furtherance of an authorized purpose" (Part I, § 3).

■ Here Allendale did not pinpoint the uses to which it would apply the net proceeds of a game, and the Control Commission passed upon eligibility without considering that topic. In short, it decided the issue of eligibility solely on the nature of the organization as revealed by its history. Of this Allendale cannot and does not complain. We will review the matter on the same basis.

■ The question is whether Allendale is a "charitable" or "educational" organization or a "civic and service club." The Control Commission concluded that Allendale was none of these but rather was a private hunting club operated primarily for the pleasure of its membership. The record amply supports that view.

The constitution of Allendale is not too revealing. Its by-laws are. They provide for 100 voting members, and also for associate members who must be of the immediate family of a voting member. The bylaws contemplate "club grounds" to which a member "of good standing can, at a certain fixed amount, bring a guest for one day hunting or fishing." When hunting or fishing, a member must wear club identification on his outer clothing and must show his membership card if accosted by another member. Its expenditures, made or contemplated, include $80 for "rental" of certain hunting grounds. Although some moneys were devoted to stocking game (90 pheasants at $3.75 each, and 72 rabbits at $2.15 apiece), some of which doubtless got away, we gather the site selected was one the members could exploit exclusively, or substantially so.

Allendale refers to certain activities which, considered in isolation, could be charitable. Thus, to an extent which the record does not reveal, it has provided food to assist wildlife through the rigors of winter, and has planted some trees to prevent soil erosion. But neither activity is the hallmark of the organization. It remains primarily a recreational association which, like many other social clubs, incidentally sponsors activities that further interests beyond those of the membership alone. Allendale cannot on that account claim the stamp of a "charitable" organization.

Nor is Allendale an "educational" organization because it offers instruction in the handling of weapons to novices interested in hunting. Apart from the doubtful "educational" quality of such instruction in the sense intended by the Constitution, it is a fringe activity which cannot obscure the main attraction of the association—good hunting for its members. Nor can Allendale be called a "civic and service club." We agree with the Control Commission that the term comprehends organizations such as Rotary and Kiwanis. We need not venture a definition. We think it enough to say that service to the civic welfare must be central to the reason for the organization's being, and thus measured, Allendale falls quite short.

The judgment of the Appellate Division is reversed and the decision of the Control Commission is affirmed. No costs.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.