624 A.2d 565

IN THE MATTER OF THE COMMISSIONER OF INSURANCE'S MARCH 24, 1992 ORDER REGARDING THE JANUARY 24, 1992 RATE FILING BY THE MARKET TRANSITION FACILITY OF NEW JERSEY.

Argued January 4, 1993—Decided May 24, 1993.

Joseph L. Yannotti, Assistant Attorney General, argued the cause for appellant Commissioner of Insurance of New Jersey (Edward J. Dauber, Acting Attorney General of New Jersey, attorney; Sharon M. Hallanan, Thomas M. Hunt, Adam Scaramella, and Katherine Motley, Deputy Attorneys General, on the briefs).

John J. Degnan argued the cause for respondent Chubb Group of Insurance Companies (Mr. Degnan and Lawrence C. Johnson, attorneys).

Julius B. Poppinga argued the cause for respondents American Manufacturers Mutual Insurance Company, American Motorist Insurance Company, American Protection Insurance Company, Atlantic Employers Insurance Company, Colonial Penn Insurance Company, Liberty Mutual Insurance Company, Lumbermens Mutual Casualty Company, Pacific Employers Insurance Company, Transamerica Insurance Company, and Utica Mutual Insurance Company (McCarter & English, attorneys for Atlantic Employers Insurance Company, Pacific Employers Insurance Company, and Colonial Penn Insurance Company; Bressler, Amery & Ross, attorneys for Lumbermens Mutual Casualty Company, American Manufacturers Mutual Insurance Company, American Motorist Insurance Company, American Protection Insurance Company, Transamerica Insurance Company, and Utica Mutual Insurance Company; Cuyler, Burk & Matthews, attorneys for Liberty Mutual Insurance Company; Mr. Poppinga, Rosalie Burrows, Gerard G. Brew, Cynthia J. Borrelli, and Anne Mohan, on the brief).

*Susan Stryker* argued the cause for respondent Aetna Casualty and Surety Company (*Hannoch Weisman,* attorneys).

*Thomas P. Weidner* argued the cause for respondent State Farm Mutual Automobile Insurance Company (*Jamieson, Moore, Peskin & Spicer,* attorneys; *Mr. Weidner* and *Deborah T. Poritz,* of counsel; *Mr. Weidner, Ms. Poritz,* and *Julie Riley Tattoni,* on the brief).

*William G. Becker, Jr.,* submitted a letter brief on behalf of respondent The Continental Insurance Company of New Jersey (*Shanley & Fisher,* attorneys).

*Suzanne M. McSorley* submitted a letter in lieu of brief on behalf of respondent Allstate Insurance Company (*Smith, Stratton, Wise, Heher & Brennan,* attorneys).

*Richard D. Catenacci* argued the cause for *amicus curiae* New Jersey Manufacturers Insurance Company (*Connell, Foley & Geiser,* attorneys; *Mr. Catenacci, Patricia J. Pindar,* and *Paul T. Fader,* on the brief).

*Elmer M. Matthews* argued the cause for *amicus curiae* American Insurance Association (*Clapp & Eisenberg,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the plan of operation created by the Fair Automobile Insurance Reform Act of 1990, *N.J.S.A.* 17:33B–1 to –63 (the Fair Act, FAIRA, or the Act). The Fair Act created the Market Transition Facility (MTF or the facility) as an agency to provide automobile-insurance coverage to high-risk drivers during a two-year phaseout of the Joint Underwriting Association (JUA), which had been created by the New Jersey Automobile Full Insurance Availability Act, *L.* 1983, *c.* 65 (C.17:30E–4) (the JUA Act). The specific issue is the validity of the Commissioner of Insurance's March 24, 1992 Order (the Order or the March 24 order), imposing "transitional assessments" of $169 million on insurance companies for their assert-

ed failure to meet the Act's "depopulation" quotas established to transfer drivers from the MTF into the private insurance market.

In *State Farm Mutual Automobile Insurance Co. v. State*, 124 *N.J.* 32, 590 *A.*2d 191 (1991), we considered the background to the Fair Act and upheld its essential features against a facial attack of unconstitutionality. The primary focus of that litigation was the imposition of additional assessments and surtaxes on insurance companies to pay off the JUA's accumulated debt of over $3.3 billion. This case concerns the accumulated debt of the MTF, the successor to the JUA. We hold that the Commissioner of Insurance (the Commissioner) lacked the authority to impose the transitional assessments either as a regulatory adjustment or revenue-raiser under FAIRA, and that in the procedural context of this case the assessments are not sustainable as a penalty or enforcement measure.

I

We retrace briefly the background set forth in *State Farm*. New Jersey's system of automobile-insurance regulation has faced "an intractable problem of providing coverage for high-risk drivers." 124 *N.J.* at 40, 590 *A.*2d 191. The objective of the JUA was "to provide such drivers with coverage at rates equivalent to those charged in the voluntary market." *Id.* at 41, 590 *A.*2d 191. The JUA was a more complex system than the prior Assigned Risk Plan, pursuant to which the Commissioner had apportioned high-risk drivers among all auto insurers doing business in New Jersey. *Id.* at 40–41, 590 *A.*2d 191.

A board of directors, primarily comprised of insurance-company representatives and insurance producers, originally governed the JUA. The board's task was to adopt a Plan of Operation to carry out the JUA's objectives. *Id.* at 41, 590 *A.*2d 191. Insurance companies (and subsequently certain non-insurer entities) could apply to become "servicing carriers" that would bear "administrative responsibility for collecting premi-

ums, arranging coverage, and the like, and which would receive fees for such services from the JUA." *Ibid.*

Because the JUA insured high-risk drivers but required their rates to be the same as voluntary-market rates, premium revenues were not expected to cover the costs of claims against JUA policies. Department of Motor Vehicles surcharges for moving violations and drunk-driving convictions, flat charges, and residual market-equalization charges (RMECs) imposed on automobile-insurance policyholders supplemented the JUA's premium income. *Id.* at 41–42, 590 *A.*2d 191. "Thus, the JUA was a system in which the insurance costs of high-risk drivers were subsidized by the imposition of fees on segments of the general population of motorists." *Id.* at 42, 590 *A.*2d 191. In theory, the JUA would operate on a no-profit, no-loss basis, with RMECs adjusted up or down as needed in the voluntary market to accomplish that goal. *Ibid.*

The JUA did not achieve its goals. A growing number of drivers were unable to obtain voluntary-market coverage, until by 1988 "over 50% of New Jersey's drivers had to be insured through the JUA." *Ibid.* In 1988, the Legislature amended various statutes to address the deteriorating condition of the automobile-insurance industry. *L.* 1988, *c.* 119 (the 1988 Reform Act). That act undertook to reform the JUA but not to eliminate it. Salient features of the 1988 Reform Act were an optional verbal threshold for tort actions, flex-rating for insurers, a reconstituted board of JUA directors, and a program to audit the JUA servicing carriers to find, recover, and penalize any overcharges made by them to the JUA. For our purposes, the most significant feature of the 1988 Reform Act was the planned depopulation of the JUA, leaving only the least-desirable risks for it to cover, which would be charged self-sustaining, unsubsidized rates. *In re Assignment of Exposures*, 248 *N.J.Super.* 367, 373–74, 591 *A.*2d 631 (App.Div.) (referring to *L.* 1988, *c.* 119, § 26; *N.J.S.A.* 17:30E–14), *certif. denied*, 126 *N.J.* 385, 599 *A.*2d 162 (1991), *cert. denied*, —— *U.S.* ——, 112 *S.Ct.* 1244, 117 *L.Ed.*2d 476 (1992). The plan was to cut the JUA

coverage over four years to no more than 40% of the total market in the first year, 30% of the market within the following year, 25% within the next year, and, finally, 20% of the total market at the end of the four-year period. *L.* 1988, *c.* 119, § 26. Despite the imposition of substantial flat charges and RMECs from 1988 through 1990, the JUA continued to operate at a deficit. *State Farm, supra,* 124 *N.J.* at 42, 590 *A.*2d 191.

Automobile-insurance reform had been a central issue in the 1989 gubernatorial campaign. One of the first initiatives of Governor Florio's new administration in 1990 was the plan of automobile-insurance reform that became the Fair Act, which was signed into law on March 12, 1990. A brief description of the Act follows.

> The principal goals of the Act were to reduce insurance costs for most New Jersey drivers, to depopulate the JUA by switching insureds to the voluntary market, and to create a funding mechanism to pay off the JUA debt. To these ends, the Act provided that the JUA would cease writing or renewing policies as of October 1, 1990. The "depopulation" of the JUA would be accomplished by classifying insured drivers into three categories: (1) high-risk drivers in the (revived) Assigned Risk Plan (10% of the market); (2) "non-standard" risk drivers, who would be insured by private insurers directly, but who could be charged rates up to 135% of those standard risks (15% of the market); and (3) standard-risk, voluntary-market insureds covered at prevailing rates (the remaining 75% of the market).

[*Id.* at 42–43, 590 *A.*2d 191.]

We presumed that the higher rates charged drivers in the first two categories "should bring the premium income on such coverage in line with actual costs, and this coverage would no longer be subsidized." *Id.* at 43, 590 *A.*2d 191. The Act required the companies to "take all comers" who were "good drivers" as of April 1, 1992. Assembly Appropriations Committee Statement, Assembly No. 1, *L.* 1990, *c.* 8, at 2, 8 (Committee Statement, *A.* 1).

FAIRA accelerated the depopulation of the JUA. It required the Commissioner, within thirty days of its effective date, to establish a new depopulation quota to take effect immediately to reduce the JUA pool to 32% of the market on or before

October 1, 1990, the date of the planned abolition of the JUA. On that date, FAIRA, in effect, transferred the pool's coverage to the MTF but provided that by April 1, 1991, no more than 29% of the exposures (that is, the drivers to be insured) would be written by the MTF and the JUA combined; by October 1, 1991, no more than 20% by the MTF alone; on or after April 1, 1992, no more than 10% by the MTF; and on and after October 1, 1992, 0% of the exposures. *N.J.S.A.* 17:33B–11.c.(5). The Act required the Commissioner to establish those quotas for exposures in a manner consistent with the market-share apportionment procedure established under the JUA's original operating code. In addition, the Act provided:

> In the event that any of the quotas established pursuant to this paragraph have not been met by the end of the applicable period, the commissioner shall direct the facility to assign the balance of exposures needed to meet the applicable quota to member companies pursuant to the apportionment procedure.

[*Ibid.* ]

II

*The Nature of the Market Transition Facility*

The Market Transition Facility is quite unlike the JUA. The JUA was initially operated by industry representatives. Neither the insurers that acted as servicing carriers nor automobile insurers as a group were liable for the losses paid on policies issued by the JUA.

On the other hand, the Commissioner operates the MTF. Furthermore, "[e]very insurer authorized to transact automobile insurance in this State shall be a member of the facility and shall share in its profits and losses as provided by the commissioner pursuant to the provisions of subsection d. of this section [concerning apportionment]." *N.J.S.A.* 17:33B–11.a. The Act required the Commissioner to appoint an advisory board of industry representatives. However, the Commissioner clearly was the chief executive of the MTF. *In re May 10, 1991 Orders*, 252 *N.J.Super.* 260, 275, 599 *A.*2d 906 (App.Div.1991), *certif. denied*, 127 *N.J.* 565, 606 *A.*2d 376 (1992).

Under the Act, the MTF was to issue automobile-insurance policies for a two-year period, ending September 30, 1992. The MTF could not issue or renew any policies on or after October 1, 1992. *N.J.S.A.* 17:33B–11.c. The Commissioner was to promulgate a "plan of operation" in consultation with the advisory board to provide (1) the applicable levels of coverage available through the facility; (2) the premiums, which should be based primarily on the JUA rates; (3) the procedures for changing rates; (4) for the issuance of policies through servicing carriers, employing the JUA staff at the discretion of the Commissioner; (5) the procedures for depopulation of the facility with a goal of 0% population at the end of the two-year period; and, among other things, "[s]uch other provisions as are deemed necessary for the operation of the facility." *N.J.S.A.* 17:33B–11.c.(1)–(9).

Several Appellate Division opinions track the MTF's troubled operating history. Among the issues decided in those opinions are: should the Commissioner have increased rates substantially on October 1, 1990, despite the Fair Act's requirement that the MTF initially use the JUA rates, which, even with RMECs, had created significant deficits? *In re May 10, 1991 Orders, supra,* 252 *N.J.Super.* 260, 599 *A.*2d 906; does the Commissioner have the authority to assign a producer's (either an agent or a broker) entire book of business to an insurer in fulfilling the insurer's quota obligations? *In re Assignment of Exposures, supra,* 248 *N.J.Super.* 367, 591 *A.*2d 631; what procedures should the Commissioner employ in setting rates under the MTF? *In re May 10, 1991 Orders, supra;* what authority did the Commissioner have to assign the producers to private carriers? *In re July 2, 1992 Order,* 261 *N.J.Super.* 292, 618 *A.*2d 894 (App.Div.1993). The two-year life span of the MTF was nearly consumed before all of the issues of its operation had been resolved.

A. *The Background to the March 24, 1992, Order*

To facilitate an understanding of this case, we set forth a limited chronology of some of the events that led to the Order

under review. We intend nothing more than a sketch of those proceedings and express no view on their effect on any later proceedings involving the MTF.

● March 12, 1990—The Fair Act becomes law.

● May 15, 1990—The Commissioner assigns to the companies their initial shares of depopulation quotas. He warns the companies that "any member company that has not written its apportionment share shall be precluded from nonrenewing policies for a 12–month period in accordance with *N.J.S.A.* 17:29C–7.1, as amended"; that quarterly reports of exposures written would be required; and that "any member company which fails to comply with the provision of the Program shall be subject to penalties as authorized by law, including the provisions of *N.J.S.A.* 17:30E–17."

● October 1, 1990—MTF begins operations; Commissioner orders 10.3% increase in MTF rates over JUA rates; first quota period passes without achievement of 68% voluntary-market target.

● October 26, 1990—Commissioner notifies companies of April 1, 1991, apportionment shares.

● January 5, 1991—Commissioner adopts Mandatory Depopulation Assignment Plan (MDAP), effectuating statutory authority to assign unfulfilled quota exposures to member companies.

● January 17, 1991—MTF seeks 28% increase in rates. (The Fair Act did not begin to eliminate flat charges and RMECs until April 1991.)

● January 24, 1991—Commissioner issues MDAP orders to forty-four companies, informing them that they would be assigned exposures because of their failure to meet October 1, 1990, quotas. The companies later appeal.

● February 15, 1991—Commissioner informs companies that Appellate Division has stayed his MDAP orders and that no assignments would be made until the court had rendered its final decision.

● April 1, 1991—Second depopulation-quota period passes.

● May 10, 1991—Commissioner grants 18.6% rate increase, to be effective June 15, 1991. That increase yielded 12.3% in revenues.

● May 20, 1991—Appellate Division renders its decision on the January 24, 1991, MDAP orders, affirming the orders in part and invalidating the orders in part. *In re Assignment of Exposures, supra,* 248 *N.J.Super.* 367, 591 *A.*2d 631.

● October 1, 1991—Third depopulation quota period passes.

● November 14, 1991—Commissioner issues quota shares for April 1, 1992, quota period.

● November 19, 1991—Appellate Division acts on Commissioner's May 10, 1991, rate orders; reflects on cascading events; orders Commissioner to develop rate-setting process; accepts Commissioner's "commitment to operate the MTF on a no-profit, no-loss basis"; orders Commissioner to act speedily under brief time table to set appropriate rates and to respond to legitimate demands for relevant records. *In re May 10, 1991 Orders, supra,* 252 *N.J.Super.* 260, 599 *A.*2d 906.

● December 20, 1991—In response to Appellate Division's November 19, 1991, decision, Commissioner increases MTF rates 14.9%, effective January 15, 1992, for new and renewal policies; announces intention to increase rates further.

● December 31, 1991—Commissioner reassigns exposures under modified MDAP; companies appeal the assignments.

### B. *The Current Controversy*

On January 24, 1992, the MTF requested a rate increase of 16.8% to be effective April 1, 1992. That rating period was to carry the MTF through its final period of operation to its planned phase-out on October 1, 1992. On March 24, 1992, the Commissioner issued his Order, No. A92–158. After implementing an eligibility-point forgiveness program that would exonerate prospectively MTF drivers who had incurred only a few points for minor violations and had no at-fault accidents

during a previous three-year period, the Commissioner found that the overall needs of the MTF required an additional 12.6% in revenues. Order at 1–2.

However, the Commissioner determined not to impose that cost on the automobile drivers in the MTF pool, pointing out that in the brief period of MTF's operation he had already raised rates 42%. Instead, he decided to impose transition assessments on the insurers. He proposed that insurers that failed to satisfy the Act's depopulation requirements pay a larger share of the MTF deficit in recognition of their failures and the consequent additional costs to the MTF. Order at 2–3. He imposed a $180 transition assessment on such companies for each exposure that was not depopulated per quota period, roughly $1.00 per day, per driver. Order at 56. Concurrent with the rate-making decision, the Commissioner proposed an amendment to the MTF's plan of operation to permit those assessments. Order at 2.

The assessments would yield approximately $169 million, $37 million of which would constitute additional revenue for the April 1, 1992, quota period, and $132 million to offset the existing deficit from the prior quota periods, October 1, 1990, April 1, 1991, and October 1, 1991. *Ibid.* The Commissioner considered inappropriate the application of the assessments for prior periods against future revenues, but found that the revenue that the transition assessments for April 1, 1992, would generate could be "conservative[ly] estimate[d] at" $37 million. Order at 59–60. That income would reduce the MTF's indicated rate need by 16.1% and obviate the need for a rate increase in the final period of the MTF. Order at 60–61. The Commissioner thus denied, on March 24, 1992, MTF's request for an additional rate increase for its final period of operation. The Commissioner also ordered implementation of the transition-assessment program.

The Commissioner viewed this result as a necessary implication of the 1988 Reform Act and the Fair Act, which had

ordered the crucial steps of depopulation. He noted that many companies accepted responsibility for depopulation and complied with the law. Of the total sixty-seven New Jersey insurers or insurer groups, approximately fifteen succeeded in meeting their depopulation quotas for each of the periods ending October 1, 1990, April 1, 1991, and October 1, 1991. Six of New Jersey's top ten insurers met twenty-one of their twenty-four target depopulation dates. Order at 8–9. The Commissioner noted that in exchange for the additional premium income from the new business, the insurers accepted the costs associated with the business, including the surcharges and assessments necessary to pay off the JUA deficit, which could not simply be passed through in the form of higher rates. Order at 9. He reflected on the history of resistance to the MDAP and ensuing litigation, the appeals to the revised orders issued on December 31, 1991, and a recently-enacted law, L. 1991, c. 462, that had caused further revisions in the MDAP. Order 10–11.

In considering the "substantial rate increases [of 42%] the MTF insureds have had to endure within just one year and the failure by a number of carriers to meet depopulation goals despite the mandatory nature of these quotas," the Commissioner concluded that MTF insureds should not have to bear the burden of some MTF-member-insurers' failure to depopulate. Order at 51. Relying on statutory authority to include in the MTF's plan of operation "such other provisions as are deemed necessary for the operation of the facility," N.J.S.A. 17:33B–11.c.(9), the Commissioner found that "the proper operation of the MTF requires the exercise of this residual power to impose assessments upon those insurers which have failed to meet their depopulation obligation for the quota periods during the MTF's existence beginning October 1, 1990." Order at 53.

The insurance companies appealed the Commissioner's Order to the Appellate Division. The court set an accelerated briefing schedule. On May 1, 1992, the Appellate Division invalidated the March 24 order and directed the Commissioner "to implement forthwith the 12.6% MTF rate increase already found by

him to be necessary." *In re March 24, 1992 Order,* 256 *N.J.Super.* 158, 161, 606 *A.*2d 851 (1992). The Appellate Division ruled that the Commissioner's determination that there was an MTF need of 12.6% required him to raise rates. The court reasoned:

> The law does not permit him to purposely set deficit rates and rely on the alternative funding source of a cash call to the voluntary market insurers. * * * [To impose] transitional assessments on certain insurers on the thesis that they did not meet their depopulation apportionment shares is unauthorized by statute, either to prevent future deficits or to reduce past deficits.

[*Ibid.*]

The Commissioner sought a stay of the Appellate Division ruling pending review in this Court. We denied the stay but granted the Commissioner's petition for certification to review the matter, 130 *N.J.* 15, 611 *A.*2d 653 (1992). The 12.6% rate increase went into effect. Given the MTF deficit, a rollback of those rates is not a realistic option. The validity of the transitional assessments alone is before us.

### III

The long-standing and well-established principles governing judicial review of agency action require that we accord an administrative regulation a presumption of reasonableness and validity. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978). "Our strong inclination, based on the principle that the coordinate branches of government should not encroach on each other's responsibilities, is to defer to agency action that is consistent with the legislative grant of power." *Lower Main Street Assocs. v. New Jersey Hous. & Mortgage Fin. Agency,* 114 *N.J.* 226, 236, 553 *A.*2d 798 (1989). Specifically with respect to the Fair Act, we have held that "[t]he statute should be liberally construed as giving the Commissioner ample authority to follow that directive [that is, to allow insurers to earn an adequate rate of return through the rate-making process] and achieve the legislative objective." *State Farm, supra,* 124 *N.J.* at 54, 590 *A.*2d

191 (citing *Allendale Field & Stream Ass'n v. Legalized Games of Chance Control Comm'n*, 41 *N.J.* 209, 217, 195 *A.*2d 620 (1963) ("We should liberally construe the [statute] to permit the agency to achieve the task assigned to it, and should imply, if need be, incidental powers reasonably adapted to that end."); *see also In re Plan for Orderly Withdrawal of Twin City Fire Ins. Co.*, 129 *N.J.* 389, 609 *A.*2d 1248 (1992) (finding that statutory scheme assures Commissioner broad powers to achieve goals of Fair Act), *cert. denied*, —— *U.S.* ——, 113 *S.Ct.* 1066, 122 *L.Ed.*2d 370 (1993).

Hence, the central focus of this controversy is on the existence of the Commissioner's statutory power to impose transitional assessments, with subsidiary questions concerning the fairness of his exercise of such power, if it exists.

The companies argue that the provisions of FAIRA on which the Commissioner relies, *N.J.S.A.* 17:33B–11.c. and –11.d., in no way confer the authority to impose assessments as a consequence of the failure to satisfy depopulation quotas. *N.J.S.A.* 17:33B–11.d. authorizes the Commissioner only to "apportion any profits or losses of the [MTF] among member companies based on each company's apportionment share as determined for purposes of depopulation," while *N.J.S.A.* 17:33B–11.c.(9) provides that the Commissioner may include in the MTF's plan of operation "[s]uch other provisions as are deemed necessary for the *operation* of the facility." (Emphasis added.) Neither provision on its face authorizes the Commissioner to levy assessments as a consequence of the failure to meet depopulation quotas. The Legislature provided the Commissioner with a specific remedy in the event that he determines that a carrier has not written its share of depopulation business. *N.J.S.A.* 17:33B–11.c.(5) authorizes the Commissioner to "assign the balance of the exposures needed to meet the applicable quota to member companies pursuant to the apportionment procedure" when an aggregate quota has not been met. In addition, *N.J.S.A.* 17:30E–14.h. provides that a company "that does not write its apportionment share of any quota * * * within the

applicable time period shall be precluded from nonrenewing automobile insurance policies." The 1988 Reform Act, specifically *N.J.S.A.* 17:29C–7.1, granted insurers some exceptions to the mandatory renewal of risks, permitting non-renewal of up to 2% of their risks as well as other non-renewal and cancellation privileges. "It is well settled that implied remedies are disfavored in the context of statutes that set out an expressly detailed remedial scheme." *Hozier v. Midwest Fasteners, Inc.,* 908 *F.*2d 1155, 1169 (3d Cir.1990).

The companies believe that a "simple reading" of both the 1988 Reform Act and FAIRA establish that only when the industry as a whole does not meet the industry-wide quotas does the Commissioner have the authority to direct the JUA, under *N.J.S.A.* 17:30E–14.c., or the MTF, under *N.J.S.A.* 17:33B–11.c.(5), to assign the balance of the exposures necessary to meet a quota to member companies in a manner consistent with the apportionment procedure. They argue that neither the 1988 Reform Act nor FAIRA provided monetary sanctions for failure to meet depopulation goals; on the contrary, the Legislature used financial incentives to encourage the process of depopulation. The companies claim that the Legislature knew the difficulty the companies would have in meeting the specific bi-annual quotas, and argue that "the Legislature wielded a carrot—not a stick."

The companies thus conclude that neither the Fair Act nor the 1988 Reform Act authorized the Commissioner to impose transitional assessments to penalize those who do not meet depopulation quotas. They also argue that even if the Commissioner has such authority, he invalidly exercised it here because (1) the assessments have a retroactive effect, (2) the Commissioner's conduct or the MTF plan of operation estops him from imposing assessments, (3) he did not act in accordance with the Administrative Procedure Act, and (4) he did not set forth adequate findings to sustain his determination.

## IV

We wish that a "simple reading" of the JUA Act, the 1988 Reform Act, and FAIRA provided an unerring answer to the issues posed in this case. To begin with, the very process of unraveling the JUA has posed great difficulties. During the years that the JUA became the dominant market force in the New Jersey automobile-insurance industry, it created levels of economic activity that have had to be reassembled. *See In re July 2, 1992 Order, supra,* 261 *N.J.Super.* at 299, 618 *A.*2d 894 (discussing the need for "an effective conduit between the voluntary market and those insureds to whom the voluntary market was theretofore inaccessible for an obvious panoply of demographic reasons" in order for FAIRA to succeed).

Hence, the MTF, as successor to the JUA, must be viewed not in the abstract, but as part of the process by which the economic structure of the high-risk New Jersey automobile-insurance industry has evolved from assigned risk to joint underwriting and now back to a form of assigned-risk insurance. In this final process, the Legislature delegated enormous responsibility to the Commissioner. It made him, in effect, the chief executive officer of the State's largest automobile-insurance company. At its peak, MTF was expected to insure approximately 1,300,000 drivers. And those were not all bad drivers. As of December 1991, "over 60% of MTF insureds [had] clean driving records." The Legislature directed that the Commissioner reassemble the fragmented pieces of the industry by finding places in the system for the automobile-insurance sales force that had grown up under the JUA and made the State's automobile insurance companies "members" of the Commissioner's company, the MTF. The MTF is obviously, then, a most unusual public entity. The Legislature gave the Commissioner full authority to include in the plan of operation provisions as "are deemed necessary for the operation" of the MTF. *N.J.S.A.* 17:33B–11.c.(9). This case tests the measure of that authority.

Preliminarily, we must ask: what is the nature of the authority exercised here? Is it a call on members of an association, is it a request for more capital from shareholders, is it a tax, is it a penalty? The Commissioner calls it a "transitional assessment" or a "regulatory adjustment." In a long series of taxation cases the Supreme Court has abandoned the notion that " 'magic words or labels' " serve any analytic function. *Complete Auto Transit Inc. v. Brady,* 430 *U.S.* 274, 284, 97 *S.Ct.* 1076, 1082, 51 *L.Ed.*2d 326, 334 (1977) (quoting *Railway Express Agency v. Virginia,* 358 *U.S.* 434, 441, 79 *S.Ct.* 411, 416, 3 *L.Ed.*2d 450, 455 (1959)). The focus is on the economic effect of the governmental action. Under FAIRA, arrangements were made to raise revenues to loan to the State to help pay off the JUA debt. *In re Loans of New Jersey Property Liab. Ins. Guar. Ass'n,* 124 *N.J.* 69, 78–79, 590 *A.*2d 210 (1991). Those "assessments" were to be regarded as "expenses" of the insurance companies albeit not directly passed through to the policyholders. *Id.* at 79, 590 *A.*2d 210. We viewed the State, however, as raising revenue, not creating debt, through those assessments. *See also New Jersey State Bar Ass'n v. Berman,* 11 *N.J. Tax* 433, 439 (1991) (noting that State agreed that "fee" imposed on lawyers under FAIRA to pay part of JUA debt is a "tax"), *aff'd in part, modified in part,* 259 *N.J.Super.* 137, 611 *A.*2d 1119 (App.Div.1992).

The Commissioner has described the assessments as "regulatory" or "equitable" adjustments designed to implement a break-even plan of operation for the MTF and to prevent unjust enrichment of companies. The companies insist that the assessments are penalties, and penalties that are not authorized by the Act. We will analyze the issues in both contexts.

### A.

### *Are the Transitional Assessments Imposed on Insurance Companies Authorized Under FAIRA as Regulatory Measures?*

Despite the magnitude of the problems confronting the Commissioner, we are unable to infer that the Legislature would

have intended to confer such authority on the Commissioner. The power to raise revenue or to tax is among the most fundamental of governmental powers. We note that one of the key features of the Fair Act was the integrated system of assessments and surcharges imposed on various participants in the industry: insurance companies, attorneys, body shops, health-care providers, and motorists. *N.J.S.A.* 17:33B–58 to – 63. The JUA Act had made no provision for the possibility of a deficit operation. FAIRA, however, provides that the private insurance member companies bear the deficit of the MTF in proportion to their depopulation shares. *N.J.S.A.* 17:33B–11.d.

In one sense, then, raising revenue from the member companies in a manner inconsistent with the Act (that is, based on their failure to achieve quotas of market share) would appear to conflict with the specific language of FAIRA. In a broader sense, that the Legislature would have delegated its revenue-raising authority to the Commissioner appears highly unlikely to us. Consider, for example, if the Commissioner had sought to emulate the model for recouping the JUA deficit and had proposed in the MTF's plan of operation an increase in fees to be charged to attorneys or auto repair shops. Such charges had been thought reasonably necessary to defray the JUA deficit. We would undoubtedly say that such measures would exceed what is necessary for the "operation of the facility." The need not to give a "statute any greater effect than its language allows" is "particularly compelling" in the context of considering the power to tax. *Kingsley v. Hawthorne Fabrics, Inc.,* 41 *N.J.* 521, 528, 197 *A.*2d 673 (1964).

Rarely does the Legislature extend revenue-raising authority with regulatory authority. When it does, it closely hems in the grant of authority. See *Public Serv. Elec. & Gas Co. v. New Jersey Dep't of Envtl. Protection,* 101 *N.J.* 95, 104, 501 *A.*2d 125 (1985) (finding that Legislature authorized the agency to administer "cost-based" permit program, not a "revenue-raiser"). In addition, we note that in meeting a constitutional challenge to the "anti-pass through" feature of the Commis-

sioner's assessments, the Department of Insurance stated in a brief to the Appellate Division:

> [T]hat portion of the allocated MTF loss caused by the insurer's failure to satisfy its depopulation obligation should be [sic] not be recoverable in rates and it is consistent to treat that portion as non-recoverable for the same reasons that fines, penalties or punitive damage awards are not recoverable. The economic consequences of a company's imprudent or wrongful actions should not be borne by its ratepayers.

The argument does suggest that the intended economic effect of the transitional assessments is a charge in the nature of a penalty.

Even were the Commissioner to have authority to craft a revenue-raising program, he would be required to follow administrative procedures commensurate with the implementation of such a program. See *Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 583 *A.*2d 277 (1990) (holding that agency's authority to implement "development fee" program under Fair Housing Act would have to be exercised under rulemaking power with standards to be established for imposition of such fees). We recognize that the MTF more resembles a business organization than a traditional agency of state government, and that procedures set forth under FAIRA were followed. Nevertheless, *Holmdel Builders* does suggest that standards would have to be set for the imposition of regulatory fees that are perhaps more extensive than the failure, without more, to meet an assigned quota. Because we conclude that the Legislature did not authorize revenue-raising authority for the Commissioner, we need not resolve the procedural aspect of this issue.

B.

*Does the Commissioner have the Authority to*
*Impose the Transitional Assessments as a*
*Penalty or Enforcement Measure?*

In *In re Directive of New Jersey Department of Environmental Protection,* 110 *N.J.* 69, 74–75, 539 *A.*2d 1181, *appeal dismissed, Kimber Petroleum Corp. v. Daggett,* 488 *U.S.* 935, 109 *S.Ct.* 358, 102 *L.Ed.*2d 349 (1988), we held that an

agency's power to compel a cleanup implied a power alternatively to exact money from the offender equal to the cost of the cleanup. Were it absolutely clear that insurance companies were ignoring a statutory obligation to clean up the JUA residue, we could more easily infer the Commissioner's authority to exact money for the remedial costs incurred by the MTF.

However, the companies have stressed that the Acts (JUA and FAIRA) imposed depopulation quotas on the industry only as a *whole* and not on *individual* companies *unless* the Commissioner had actually assigned specific risks (the high-risk drivers) to a company that refused to issue a policy to the assigned risk. One company likened the pool of high-risk drivers to a "lake" and asked us to consider how some companies equipped with trawlers and seines were able to harvest their quota from the lake whereas others without such resources (small sales forces, no agents in the field) were unable to land their drivers from the pool. The companies emphasize that the "obligation" in *N.J.S.A.* 17:33B–11.c.(5) contemplates that each member's share will be fulfilled by *both* its sales efforts *and* the mandatory assignments of the Commissioner. The companies cannot force the consumer to buy.

The difficulty with the argument is that it assumes that all parties made an industrious attempt to harvest at the water's edge. That may not have been the case. Some may have "thumbed [their] nose[s]" at the Commissioner. *In re March 24, 1992 Order, supra,* 256 *N.J.Super.* at 172, 606 *A.*2d 851. Just as we doubt that the Legislature would have intended to delegate its general revenue-raising authority, we doubt that it would have intended that the Commissioner be powerless to deal with obstructionism beyond a denial of non-renewal privileges. The Commissioner insists that the language of the Act is mandatory: "the [MTF] plan shall prescribe the number of voluntary market exposures which *shall be written* during each six-month period." *N.J.S.A.* 17:33B–11.c.(5). To interpret those numbers only as goals for individual companies (only the industry having a quota under this view) would conflict with the

remainder of the section's provisions for assigning the "balance of the exposures." What balance? If the "balance of the exposures" means the industry's balance, presumably the Commissioner would be required to reassign the unharvested risks among all of the member companies in accordance with their market shares. What then would be the meaning of the "credit for the excess" that overachievers might receive against apportionment share for later periods?

The companies have emphasized the parallel between the statutory procedures for depopulating the JUA and those for the MTF. In effect, the MTF procedures "piggybacked" on the JUA's depopulation procedures. The loss of the 2% renewal and cancellation privileges for not achieving depopulation quotas was found in the 1988 Reform Act, *N.J.S.A.* 17:30E–14.h. The first depopulation quotas under FAIRA were to be accomplished at a time when the JUA was still in existence. The Commissioner described MTF as the functional successor to the JUA. One counsel likened the MTF to a lineal descendant of the JUA. In fact, the MTF did not appear at all in FAIRA as originally proposed. *See* A.1, 204th Leg., 1st Sess. (1990). Because of foreseeable turmoil if the JUA were to collapse on itself on October 1, 1990, the Assembly Appropriations Committee chose to add the MTF to FAIRA rather than to extend the life of the JUA. Committee Statement, *A. 1, supra,* at 3.

In *In re Assignment of Exposures, supra,* the court noted that FAIRA did not entirely displace the provisions of the 1988 Reform Act. Language that is part of the 1988 Reform Act that appears in the Fair Act is not to be regarded as merely " 'a remnant' of earlier legislation which somehow slipped into the new law." 248 *N.J.Super.* at 381, 591 *A.*2d 631. The 1988 Reform Act included the penalty provision that "[a]ny member company that does not write its apportionment share of any quota established by the commissioner * * * shall be precluded from nonrenewing automobile insurance policies pursuant to section 26 of this 1988" Act. *L.* 1988, *c.* 119, § 25 (codified at *N.J.S.A.* 17:30E–14.h.). As noted, the 1988 Reform Act had

permitted non-renewals "in an amount not to exceed 2% of the total number of voluntary market" exposures and other non-renewal and cancellation privileges. *L.* 1988, *c.* 119, § 26 (codified at *N.J.S.A.* 17:29C–7.1.b.). However, the 1988 Reform Act added a significant amendment in section 42:

> In the event the association [the JUA] sustains a financial loss due to any act or omission of any producer, member company or servicing carrier which violates any statutory, contractual or *plan of operation requirement*, the commissioner may, *in addition or as an alternative* to the penalties provided in subsections a. and b. of this section, [authorizing the Commissioner to revoke or suspend certificates of authority or licenses to write business for the JUA and/or to assess fines of up to $10,000] order the restitution of any moneys owed to the association, and the reimbursement of reasonable costs of investigation and prosecution.
>
> [*L.* 1988, *c.* 119, § 42 (codified at *N.J.S.A.* 17:30E–17.c.) (emphasis added.)]

Our courts have construed that paragraph to authorize the Commissioner to undertake administrative proceedings to recover losses sustained by the association due to the misconduct of any of the association members. *In re Certification,* 254 *N.J.Super.* 620, 631, 604 *A.*2d 172 (App.Div.1992).

That paragraph of the 1988 Reform Act does not by its terms appear in the Fair Act. On the other hand, it is not repealed. If a servicing carrier of the MTF engaged in the type of misconduct described in *In re Certification, supra,* would the Commissioner be powerless to remedy the wrong done to the facility because a penalty provision such as *N.J.S.A.* 17:30E–17.c. did not appear in FAIRA? Would he not have the implied authority to redress a breach of the plan operations? We note that in his May 15, 1990, assignment of shares, the Commissioner had referred to the penalties of *N.J.S.A.* 17:30E–17 as though applicable to violations of the program.

At a minimum, the Commissioner argues that the penalty-enforcement authority under *N.J.S.A.* 17:33–2 would confer the necessary authority to sanction the non-complying companies. He notes that the Fair Act provisions for depopulation in *N.J.S.A.* 17:33B–11.c.(5) are within a supplement to a chapter of Subtitle 3, which Subtitle incorporates chapters 17 through 51 of Title 17. Therefore, he argues, the penalties in *N.J.S.A.*

17:33–2 would apply to violation of the statutory requirements for depopulation. (FAIRA provided enhanced penalties of up to $2,000 for the first violation and $5,000 for each violation thereafter of its "take-all-comers" provisions. *N.J.S.A.* 17:33B–21.)

We recognize that the 1988 Reform Act and to some extent the Fair Act adopted a "carrot and stick" approach to the depopulation of the JUA and the MTF. The Legislature designed the flex-rating provisions to encourage the private market to accept exposures more freely from the State pools. It intended the non-renewal and cancellation provisions to give companies more flexibility. We are not so certain that withdrawing those latter carrots would have exhausted the Commissioner's use of a stick. The companies' contentions that the Commissioner is estopped from seeking the assessments or that the MTF plan misled them into waiting for assignments would be substantive defenses to an exercise of such authority; they do not establish that the exercise would be beyond the Commissioner's powers. The claims of detrimental reliance asserted by the companies raise fact-sensitive issues. A hearing would be required to resolve those claims. As we understand the Commissioner's present procedures, he would allow a hearing only on the calculation of the amounts due.

That the MTF enabling legislation conferred certain specific penalty powers on the Commissioner may not then have detracted from the enforcement powers that existed under the JUA as assumed or taken over by the MTF. In any event, that the Commissioner did not purport to exercise such authority appears reasonably clear to us. The very concept of the imposition of a penalty involves the concept of fault. Indeed, in his Order, the Commissioner emphasized that the carriers have "persistently failed to meet their depopulation quotas" and have never "attempted to comply with their obligation under the law." The carriers vigorously deny such assertions. No company has violated a direct order assigning risks or failed to submit a compliance plan. Some assert reliance on the lan-

guage of their share assignments and the MTF's plan of operation that set forth only certain specific penalties but not any threat of assessments. Although the member companies that have been subject to the transitional assessments have participated in various proceedings with the Commissioner concerning the effectuation of their depopulation plans, that the Commissioner's transitional assessments are based on concepts of fault does not appear from this record. In fact, before us, the Attorney General described it as a "no-fault system." For example, we note the efforts some of the Cigna companies made to negotiate with the Commissioner concerning the insurers' depopulation quotas. Other companies claim reliance on acceptance of producers and participation in various plans to have met their shares of the quota. Some depopulation plans received neither approval nor disapproval, leading companies to believe that they were fulfilling their obligations. The type of procedure that would result in the assessment of a penalty would necessarily contemplate evaluation of those issues and a hearing to resolve disputed factual issues.

## V

In sum, we are unable to infer that the Legislature would have intended to confer on the Commissioner the regulatory power to raise revenue to reduce the MTF deficit. If we were to view the power to impose the assessments as the power to impose a penalty, assuming the statute granted such residual power, the exercise of that power would have to be accompanied by procedures commensurate with the financial consequences involved.

To permit those who had enlarged the MTF deficit by failing to depopulate the JUA to bear no greater burden than those who had met their quota would be anomalous. FAIRA "mandate[s] that the shift of insureds from the residual to the voluntary market be shared equitably by all insurers." *Twin City Fire Ins. Co., supra*, 129 *N.J.* at 408, 609 *A.2d* 1248. The

companies, however, deny that their failure to depopulate caused the deficit. They argue that the Commissioner caused the deficit by setting rates that were too low or by failing specifically to assign the risks to the companies. However, the summary of the report of O'Neil Consulting Services concluded that "between $50 and $147 million of the MTF loss is due to unmet depopulation quotas," and the Commissioner points out that the companies repeatedly challenged his efforts to assign risks.

The intensity of the debate between the parties has characterized the MTF cases. The parties disagree "at the tops of their voices * * *. * * * They also accuse each other of bad faith, and describe each other's motives as unworthy, tactics as inappropriate, and goals as improper. There is a counterproductive air of distrust and hostility that surrounds the subject and displaces reasonable discussion." *In re Assignment of Exposures, supra,* 248 *N.J.Super.* at 388, 591 *A.*2d 631. That atmosphere has led our Appellate Division to note that it is "regrettable that so much litigative effort has been attributable to a truly astonishing lack of prior communication between the Commissioner and the insurers." *In re July 2, 1992 Order, supra,* 261 *N.J.Super.* at 306, 618 *A.*2d 894.

We recognize the "intractable" nature of the problem of providing insurance for high-risk drivers. The issues, however, are finite. Their resolution remains entirely within the competence of the legislative and executive branches of government. We thus decline the motion by *amicus* New Jersey Manufacturers Insurance Company to expand the record in order to resolve how the MTF deficit is to be funded and to restrain the Commissioner from any further action to impose the MTF losses on the member companies. We are aware that legislative leaders are at this time considering amendments that would address the methods of paying the MTF deficit, now estimated at $879 million. See *S.* 1451, 205th Leg., 2d Sess. (1993) and *A.* 108, 205th Leg., 2d Sess. (1993). Those bodies are best able to weigh the competing social and economic forces at

work here and to resolve definitively the extent and measure of the Commissioner's authority.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*Opposed*—none.